**TIC–THE INDUSTRIAL COMPANY SOUTHEAST, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 96–1465.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1997.

Decided Oct. 7, 1997.

Lawrence W. Marquess argued the cause for petitioner, with whom Todd A. Fredrickson, Denver, CO, was on the briefs.

David A. Fleischer, Senior Attorney, National Labor Relations Board, Pickerington, OH, argued the cause for respondent, with whom Linda R. Sher, Associate General Counsel, South Euclid, OH, and Aileen A. Armstrong, Deputy Associate General Counsel, Washington, DC, were on the brief. Margaret G. Neigus, Supervisory Attorney, entered an appearance.

Before: EDWARDS, Chief Judge, WALD and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

TIC—The Industrial Company Southeast, Inc. ("Company") performs construction services in the southeastern United States. The Company's hiring policy for its Trapp, Kentucky project required job applicants to complete applications at the Winchester office of the Kentucky Department of Employment Services ("Job Services") on special watermarked forms, and to omit information not requested thereon. Members of International Brotherhood of Electrical Workers, Local Union No. 183 ("Local 183") and United Association of Journeymen and Apprentices of

the Plumbing and Pipe Fitting Industry of the United States and Canada, Local 452, AFL–CIO ("Local 452") (collectively, "Unions") submitted two sets of job applications, completed at their union halls, on photocopied forms indicating union affiliation. The Company refused to consider these applications because they did not conform to its application guidelines.

The General Counsel of the National Labor Relations Board ("Board") issued a complaint against the Company, charging a violation of section 8(a)(3) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(3) (1994), attributable to the Company's failure to consider the Union applications. An Administrative Law Judge ("ALJ") subsequently allowed the General Counsel to amend the original complaint to charge two violations of section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (1994), for two statements allegedly made by company supervisors that purportedly interfered with employees' union rights. After a hearing on the amended complaint, the ALJ found that the Company had discriminated against the Union applicants. The ALJ also found that the Company had violated section 8(a)(1) by virtue of the two supervisor statements. The Board adopted the ALJ's findings. *TIC–The Industrial Company Southeast, Inc.,* 322 N.L.R.B. No. 103, 1996 WL 691434 (Nov. 29, 1996), *reprinted in* Joint Appendix ("J.A.") 37. We grant the petition for review opposing the Board's finding of an 8(a)(3) violation. On the record at hand, there is no substantial evidence supporting the finding of discriminatory refusal to consider the Union applications. We further find that the ALJ acted without justification in allowing the General Counsel to amend the complaint with respect to one of the supervisor statements, because the new allegation did not share sufficient factual affiliation with the original charge. With respect to the other supervisor statement, we find that while the ALJ correctly permitted amendment, there was no substantial evidence supporting the finding of an 8(a)(1) violation. Accordingly, we grant the petition for review challenging the findings of 8(a)(1) violations.

## I. BACKGROUND

In late February 1994, the Company began construction of turbine generating stations at Trapp, Kentucky. It recruited employees through Job Services, and provided written application guidelines: applicants were required to write in ink on special watermarked application forms, complete the forms at Job Services, and not attach résumés or include any extraneous information not requested, such as "Vet, Boy Scout or Union Organizer." Applicants could not apply for "any position" but only for unfilled positions. J.A. 40.

When positions became available, the Company would inform Job Services, which would post a notice on its bulletin board and provide applicants with watermarked application forms. A Company manager would come to Job Services and screen the applications, collecting those that conformed with the guidelines and leaving behind those that did not. J.A. 40–41. Job Services had a policy of contacting persons whose applications did not conform; however, because of personnel limitations, this policy was not always followed. Transcript ("Tr.") at 580–81. There is absolutely nothing in the record to suggest that Job Services distinguished between Union adherents and other persons in processing job applications for the Company.

On "two or three" occasions, according to unopposed testimony credited by the ALJ, a Company manager asked Job Services to contact particular applicants whose applications did not conform to ask these persons to submit proper applications. J.A. 41. On one such occasion, a Job Services employee added the word "Vet" to some applications that were otherwise in proper form. After the Company rejected the applications for extraneous information, Job Services' Veterans Representative contacted the applicants at the apparent request of the Company, asking them to reapply. J.A. 41, Tr. 584.

In August 1994, Job Services explained the Company's guidelines to the business manager of Local 183. Tr. 572–78. Following this conversation, on August 17, the business agent of Local 452 distributed xeroxed applications at his union hall. Twelve union members filled out the xeroxed application forms

and returned them to the business agent, who wrote "Union organizer" on each of them and mailed them to Job Services. J.A. 41. Job Services mailed the applications to the Company. On August 22, Local 183 mailed ten members' applications on xeroxed forms to Job Services. Nine of the ten listed union locals as the only previous employer. J.A. 41. (One of these applicants was not named in any subsequent proceedings.)

Noting that the Local 183 applications lacked watermarks and had been mailed, Company Safety Manager Knight rejected the Local 183 applications, and forwarded them to Terry Cooksey, the Company's Director of Personnel and Safety. Cooksey returned the applications to Job Services. Noting the lack of watermarks and the extraneous information "Union organizer," Knight also rejected the Local 452 applications, first sending them to Job Services, then retrieving them and passing them to Cooksey, who retained them in anticipation of litigation. J.A. 41–42.

On August 29, 1994, the Company hired electrician John Barck. He testified that, on his first day of work, he asked Area Superintendent James Smith, who had hired him for the project, whether the Company needed more employees. Smith indicated that the Company was hiring, but that "the only way they were taking applications is if you were ... a prior employee or if you were referred by somebody, in order to avoid bringing in union personnel." J.A. 41. Shortly thereafter, Foreman Rick Queen, whose responsibilities included reviewing job applications and interviewing, asked Barck whether any employees on the Trapp project were "union." Queen indicated that the Company suspected two employees of union activity. Barck replied that he did not know of any union membership or activity. J.A. 41. The ALJ credited Barck's account of the two conversations over the supervisors' denials. J.A. 41 & n.7.

The ALJ found that, because the Company had occasionally asked Job Services to contact non-conforming applicants to request new applications, and had not done so with respect to applications submitted by persons claiming to be union adherents, the evidence indicated a violation of section 8(a)(3). The ALJ also found that the supervisors' comments, reported by Barck, had violated section 8(a)(1). The Board affirmed the ALJ's findings, and ordered appropriate remedies.

## II. ANALYSIS

### 1. Evidence of Anti–Union Discrimination

■ Board findings must be respected on review if supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e) (1994); Laro Maintenance Corp. v. NLRB, 56 F.3d 224, 228–29 (D.C.Cir.1995). In this case, it is clear that the record before the ALJ did not contain substantial evidence to support the conclusion that the Company's refusal to consider the Union applications constituted discrimination in violation of section 8(a)(3). The Union applications indisputably failed to conform to the Company's facially neutral hiring guidelines. The evidence of disparate treatment of Union applications consisted of testimony that on "two or three" occasions the Company asked Job Services to contact persons whose applications did not conform, but had not made a similar request with respect to persons whose applications identified them as Union adherents.

■ Under Wright Line, 251 N.L.R.B. 1083, 1980 WL 12312 (1980), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), approved by the Supreme Court in NLRB v. Transportation Management Corp., 462 U.S. 393, 402–03, 103 S.Ct. 2469, 2474–75, 76 L.Ed.2d 667 (1983), the General Counsel is required to "make a prima facie showing sufficient to support the inference that protected [i.e. union-related] conduct was a 'motivating factor' in the employer's decision" to take adverse action. Wright Line, 251 N.L.R.B. at 1089. If the General Counsel succeeds in that showing, the burden then shifts to the Company to rebut the inference by showing by a preponderance of the evidence that it would have rejected the applicants even absent union affiliation. Id.

The ALJ concluded that the facts here made out "a prima facie showing that the union affiliation of the 21 rejected job appli-

cants was a motivating factor in [the Company's] decision to reject them." J.A. 42. The ALJ relied on three pieces of evidence in determining motivation: the Company's knowledge of the applicants' union status; its disparate treatment of other rejected applicants; and its anti-union animus, as inferred from the testimony of employee John Barck. *Id.* Even taken as true, these pieces of evidence do not suffice for a *prima facie* showing.

■ Prohibited motive will not be inferred where job applicants fail to follow regularly applied, facially neutral application procedures. *See Zurn Nepco,* 316 N.L.R.B. 811, 818, 1995 WL 128054 (1995) (no discriminatory refusal to hire where company followed its facially neutral procedure "in almost all cases"); *Fluor Daniel, Inc.,* 311 N.L.R.B. 498, 499, 1993 WL 188276 (1993) (insufficient evidence of anti-union motive where applicant filed incomplete application), *enforced and remanded,* 102 F.3d 818 (6th Cir.1996). Here, the ALJ acknowledged that the Company regularly refused to consider all non-conforming applications and it was undisputed that the Union applications did not conform to the guidelines. J.A. 40–41. The mere fact that the Company knew the applications were from Union applicants does not show animus. *Cf. Fluor Daniel, Inc.,* 311 N.L.R.B. at 499 (company's knowledge of applicant's union affiliation did not suffice to show animus).

There was also insufficient evidence of disparate treatment of other applicants. It was Job Services' policy to contact *all* persons whose applications did not conform with the guidelines, without regard to Union affiliation. That the Company on two or three occasions asked Job Services to follow its own policy cannot support a finding of discrimination where the Company did not make such a request. The record does not provide any evidence of a baseline practice from which the Company discriminatorily deviated in its treatment of the Union applications.

■ Finally, the supervisor's statement to the effect that the Company sought to avoid hiring union personnel might have given the Board reason to search for more evidence of discrimination, but did not on its own suffice to prove antiunion animus. A showing of animus requires greater proof than a single comment by a supervisor to the effect that the company preferred to hire non-union personnel. *See, e.g., Tualatin Elec., Inc.,* 319 N.L.R.B. 1237, 1239, 1995 WL 788569 (1995) (animus existed where owner evinced "deep hostility" towards union, which he called "organized crime"); *Ultrasystems Western Constructors, Inc.,* 310 N.L.R.B. 545, 554, 1993 WL 53789 (1993) (animus existed where company directives called union "infection" and where "numerous incidents of coercion" occurred), *enforcement denied and remanded,* 18 F.3d 251 (4th Cir.1994), *on remand,* 316 N.L.R.B. 1243, 1995 WL 232080 (1995). Furthermore, there was no evidence that the supervisor had any role in refusing to consider the Union applicants here.

■ Because the General Counsel did not make a *prima facie* showing of anti-union animus, the burden did not shift to the company to show by a preponderance of the evidence that it would have refused to consider the applications even had they not belonged to Union applicants. *See Wright Line,* 251 N.L.R.B. at 1089. However, even if the *Wright Line* burden had shifted, the Company met its burden of showing that it would have refused to consider the applications regardless of the applicants' union affiliation. Where a company has consistently followed neutral guidelines, and does so in the case in question, it has met its burden of showing it would have refused to consider applications that deviated from the normal procedure. *See VOS Elec., Inc.,* 309 N.L.R.B. 745, 753, 1992 WL 370181 (1992) (company burden satisfied where company "demonstrated that applications, from whatever source, were all processed in the same manner"). Here, undisputed testimony indicated that the Company normally rejected nonconforming applications. J.A. 40–41. No evidence suggested that the Company actively considered non-conforming applications. Thus, the Company would have refused to consider the Union applications even had they not been made by Union members.

### 2. *Amendments to the Original Charge*

■ When the Board considers allegations not contained in an original charge, "it must limit itself to matters sharing a significant factual affiliation with the activity alleged in the charge." *G.W. Galloway Co. v. NLRB,* 856 F.2d 275, 280 (D.C.Cir.1988). The Board looks to whether the complaint (1) involves the same legal theory as the charge allegation, (2) arises from the same factual circumstances or sequence of events as the charge allegation, and (3) raises similar defenses as the charge allegation. *Nickles Bakery, Inc.,* 296 N.L.R.B. 927, 928, 1989 WL 224354 (1989); *see also Drug Plastics & Glass Co., Inc. v. NLRB,* 44 F.3d 1017, 1021 (D.C.Cir. 1995) (endorsing and applying *Nickles Bakery* test). It is insufficient that the allegations merely emerge from the same antiunion campaign. *Id.* at 1021.

■ One of the amended allegations of section 8(a)(1) violations did not share a significant factual affiliation with the discriminatory refusal to consider the Union applications alleged in the original complaint. This amended allegation charged that a Company supervisor had asked for information about union affiliation of employees at the work site. This did not involve the same legal theory as the charge of refusal to consider applications, nor indeed did it involve hiring at all. It arose from a different incident than that of the Union applications, and raised the defense of denial or disowning of the incident, rather than any defense related to the Union applications. In short the charge failed all three required grounds of relatedness.

■ The other amended charge alleged that a supervisor had communicated to an employee a Company preference for non-union hiring. This amended allegation was properly allowed, because it shared a significant factual affiliation with the original charge. However, the single, isolated comment that forms the entire basis for the alleged 8(a)(1) violation did not constitute substantial evidence of restraint, coercion, or interference with employees exercising protected rights under section 8(a)(1). Nothing in the record suggests that the supervisor had any authority to establish policies with respect to hiring or treatment of employees. There is no evidence that the supervisor's statement tended to coerce any employees' exercise of protected activity. There is also no evidence that either John Barck, who heard the statement, or other employees could have been coerced in any way by the mere assertion that the Company preferred non-union hiring. *Cf. E&L Transport Co. v. NLRB,* 85 F.3d 1258, 1273–74 (7th Cir.1996) (no 8(a)(1) violation where employer statement could not have coerced employees who heard it). Indeed, it appears that the General Counsel introduced the amended 8(a)(1) allegations primarily to buttress the case for 8(a)(3) violations against the Company. Regardless of the General Counsel's purpose, the statement alone was not substantial evidence sufficient to support a violation of 8(a)(1).

### III. CONCLUSION

In light of the foregoing, the petition for review is granted and the cross-application for enforcement is denied.

*So ordered.*