# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 17, 2006        Decided July 14, 2006

No. 05-1127

PROGRESSIVE ELECTRIC, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL 265,
INTERVENOR

———

Consolidated with
05-1157

———

On Petition for Review
and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

———

*William A. Harding* argued the cause and filed the briefs for petitioner.

2

*Kira Dellinger Vol*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, Acting General Counsel, *John H. Ferguson*, Assistant General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Fred B. Jacob*, Attorney.

*Michael J. Stapp* was on the brief for intervenor.

Before: SENTELLE, BROWN and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Progressive Electric, Inc. ("Progressive") petitions for review of the National Labor Relations Board ("the Board") decision and order finding that Progressive violated Sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (3). The Board concluded that Progressive committed unfair labor practices by (1) threatening employees with job loss and facility closure on account of union activities and (2) failing to consider and hire a group of union members. Finding substantial evidence, we deny the petition for review and grant the Board's cross-application for enforcement.

I

Progressive, located in Lincoln, Nebraska, is a non-union electrical contractor in the construction business. Over a decade ago, the International Brotherhood of Electrical Workers, Local 265 ("the Union") targeted Progressive for organizational purposes. Progressive did not go quietly.

3

A

In February 1996, Progressive advertised in the local paper that it was "accepting applications" for "electrician/technician," and directed interested parties to Progressive's physical address. At the behest of the Union, David Cousins responded to the ad in order to organize Progressive. During the application process Cousins did not reveal his Union affiliation. He was hired and began work in early March. Around the same time, Charles Randall, a member of an out-of-town union, also responded to the ad and was hired. His past union affiliation was apparent on his resume and he initiated a discussion of it at his job interview with Randy Neeman, Progressive's president. Randall started work on February 20 and, in early March, he agreed to help the Union in its organizational efforts. On March 27, Cousins sought an application for a friend but was informed that there were no longer open positions and that Progressive was not accepting applications.

On March 29, pursuant to a decision by the Union's executive board, eight union journeymen electricians ("the Union Applicants") went as a group to Progressive's office to apply for jobs.[1] They were "equipped with a video camera and tape recorder" and were wearing clothing identifying their union affiliation. Gathered outside the office, the Union Applicants, talking among themselves, made statements such as "We should go in there before they have a chance to react"; "That son-of-a-bitch [Neeman]"; "'He's calling his attorney.' 'That's all right. That will cost him.'"; and "'Do you know if he's hiring or taking applications?' 'No, but I got three salts. We have three salts in here.'"

---

[1] The Union Applicants were seven members of the Union and one member of an affiliated union.

When the Union Applicants entered Progressive's office and stated their desire to apply for employment, Neeman told them:

> You guys, we are not hiring. We are not taking no [sic] applications. We advertised three [or] four weeks ago. We hired a couple of people and filled the spots. So I would love to put you all on and as soon as I get an opening I will give you guys a call.

The Union Applicants provided Neeman with a letter stating they wished to be considered for employment and listing their names and contact information. As soon as the Union Applicants left, Neeman threw away the information. Neeman later admitted that he never intended to call the Union Applicants, but only made that statement to get them to leave. On April 2, Progressive posted the following notice in its window: "Applications, as well as Names are not being accepted at this time. Video Cameras and recording devices are prohibited. Sales Reps. by appointment only."

On April 8, Don Hildreth, a Progressive foreman, told Cousins and one other employee that Neeman had called Randall the "bad apple in the barrel, and [Neeman] didn't want any union crap around here." Hildreth continued: "[I]f the Unions got into Progressive, . . . Progressive would lose [certain] contracts, and [Progressive] would go out of business . . . because [Progressive] couldn't afford the Union wages and benefits." On April 26, Randall walked off of a job site and announced that he was on strike because he was not being paid union wages.

On May 1, Neeman held a company meeting. Just before it began, Neeman informed Randall that when Randall had walked off the job five days earlier it was not a "strike" but instead a "voluntary quit." Randall, now out of a job, was directed to

leave. Shortly thereafter, Neeman addressed the remaining employees, commented on Randall's "recruiting" efforts, and stated that Randall was trying "to cost all you guys your jobs . . . and that's why we have to put a stop to it." Later, Neeman spoke to the assembled employees:

> Alright . . . I've been quiet up 'til now, which is strange for me I know and because I had to get a lot of legal advi[c]e before I could open my mouth. But now that we know what we're talking about[,] we're gonna talk about this dirty word . . . UNION . . . okay! Let's talk about unions. Are we for it, Bill and I? NO! Are you guys for it[?] I don't want to know. . . . I can't ask ya, but I can give ya my opinion on it.

Neeman's presentation was punctuated by phrases such as "Mr. Asshole Union Rep." (describing a hypothetical union member) and "bunch of dummies" (describing union members in general). At some point in the presentation Neeman wrote the word "union" on the board, drew a circle around it, and put a slash through it. Perhaps in an effort to soften the edges, Neeman also made statements to convey ambivalence toward union activities, such as: "[Randall] didn't lose his job, for the record, because of some organization[.] . . . Far as I know, half you guys are with some organization and I don't care."

Progressive subsequently filled a number of positions, using various means. On May 27, 1996, Steve Baumli became a Progressive employee doing ladder rack work; he had been performing work for Progressive on a temporary basis (via a temp agency) for a couple of months. No job vacancy was advertised for this position. On May 31 and June 13, Progressive placed ads indicating that positions were available for ladder rack installers. As a result of these ads, Progressive hired

three ladder rack installers in the month of June. Each of the ads provided a specific mailing address (a P.O. Box) for job-seekers to submit their information and indicated applications would be accepted for a set number of days. These "blind" advertisements, unlike ones Progressive previously used, did not provide any identifying information (such as Progressive's name, physical address, or phone number). In January and March of 1997, Progressive placed three ads for apprentice electricians each of which provided job seekers with Progressive's physical address. As a result, Progressive hired two individuals on January 27, 1997, and one more on March 10, 1997.

At no point from March 1996 to March 1997 was any Union Applicant contacted or offered employment, even though the Union Applicants were qualified for all seven positions described above.[2] From April to July of 1996, Jim Pelley (the Union Business Manager, who was one of the Union Applicants) sent three letters on Union letterhead via fax to Progressive in order to follow up on the events of March 29, 1996; the letters expressed the Union Applicants' continuing interest in employment and included the same sheet of contact information as the Union Applicants has previously submitted. Union records show that Progressive received each fax. Pelley also sent these letters via both certified and first class mail, but they were refused and returned. Two of Pelley's letters requested that Neeman "please inform [the Union Applicants] of any efforts [they] must undertake in order to be fully considered for employment." A final letter was sent on March 27, 1997. Progressive's only response, on April 4, 1997, rejected the "renewed" request

---

[2] On April 28, 1996, Progressive placed a blind ad for an HVAC/Energy management system installer, a position requiring higher qualifications than any of the Union Applicants possessed. Jerry Hiestand filled that position on May 17, 1996.

for consideration. The letter stated that Progressive had not accepted any applications from the Union Applicants, either on or after March 29, 1996. Neeman noted in the letter that "it is not [his] policy to seek out individuals who have indicated a desire to make application in the past whenever an opening comes up in the future."

B

On August 9, 1996, the Union filed an unfair labor practice charge with the Board and amended it on September 18. On September 30, the Board's General Counsel issued a complaint alleging various violations of Sections 8(a)(1) and 8(a)(3) of the Act. The complaint was amended on May 13, 1997, and the case was tried before an administrative law judge ("ALJ") from June 30 to July 3, 1997. On November 18, 1997, the ALJ found, in relevant part, that Progressive committed unfair labor practices by threatening employees with plant closure (on April 8, 1996) and job loss (on May 1, 1996) and by refusing to consider and hire the Union Applicants. On August 23, 2000, at the Board's direction, the ALJ issued a supplemental decision in light of *FES (A Division of Thermo Power)* ("*FES*"), 331 N.L.R.B. 9 (2000). Over four and a half years later, the Board largely upheld the ALJ's decision, albeit with some modification. *Progressive Elec., Inc.*, 344 N.L.R.B. No. 52, 2005 WL 762117 (Mar. 31, 2005). The Board, agreeing with the ALJ, found that Progressive violated Section 8(a)(1) by "threatening the loss of employment if employees engaged in union activities and by threatening to close its facility," and violated Sections 8(a)(3) and 8(a)(1) by "refusing to consider [the Union Applicants] for employment, and by failing and refusing to hire them,

because of their union affiliation." *Id.* at *1.[3] The Board ordered various remedies, including a refusal-to-hire remedy for seven of the eight Union Applicants and a refusal-to-consider remedy for the eighth. *Id.* at *3-4. Progressive petitions for review, the Board files a cross-application for enforcement, and the Union intervenes.

II

Our role here is a limited one, as the Board's factual findings are "conclusive" if "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e)-(f). In making that determination, "we ask only whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion[s], giving substantial deference to the inferences drawn by the [Board] from the facts." *Ceridian Corp. v. NLRB*, 435 F.3d 352, 357 (D.C. Cir. 2006) (internal quotation marks and citation omitted); *see Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 366-67 (1998). So long as the Board's findings are reasonable, we will not substitute our own judgment even if we would have come to a different conclusion in the first instance. *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995).

III

We turn first to Progressive's threats. According to Progressive, substantial evidence is lacking for the Board's conclusion that Progressive violated Section 8(a)(1) of the Act by threatening employees with loss of employment and plant

---

[3] The Board, however, rejected the ALJ's decision insofar as it found several additional unfair labor practices.

closure on account of protected activity. We take a different view.

Under Section 8(a)(1), it is an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7, to wit: "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §§ 157, 158(a)(1). An employer's statement violates Section 8(a)(1) if, "considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with those rights." *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001); *cf. TIC–The Indus. Co. Se. v. NLRB* ("*TIC*"), 126 F.3d 334, 339 (D.C. Cir. 1997) (holding that a "single, isolated comment" by a supervisor indicating the employer's preference for non-union hiring "d[oes] not constitute substantial evidence of restraint, coercion, or interference with employees exercising protected rights under section 8(a)(1)").

While "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union," such communications must not "contain a 'threat of reprisal or force or promise of benefit.'" *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (quoting 29 U.S.C. § 158(c)); *see Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 924 (D.C. Cir. 2005). As relevant to the present case, Section 8(a)(1) prohibits coercive statements that threaten employees with job loss or plant closure in retaliation for protected union activities. *See Tasty Baking*, 254 F.3d at 124; *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 952-53 (D.C. Cir. 1988); *Tom Rice Buick, Pontiac &*

*GMC Truck, Inc.*, 334 N.L.R.B. 785, 792 (2001). We "must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Gissel Packing*, 395 U.S. at 620; *see Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 106 (D.C. Cir. 2003); *Timsco, Inc. v. NLRB*, 819 F.2d 1173, 1178 (D.C. Cir. 1987) ("[T]he line between prediction and threat is a thin one, and in the field of labor relations that line is to be determined by context and the expertise of the Board.").

A

Progressive first challenges the Board's finding that, at the company meeting on May 1, 1996, Neeman unlawfully coerced employees by threatening their jobs, in violation of Section 8(a)(1). As previously described, shortly after informing Randall he no longer had a job at Progressive, Neeman told the remaining employees assembled for the meeting that Randall's actions were going to "cost all you guys your jobs . . . and that's why we have to put a stop to it." Neeman went on to offer his thoughts about that "dirty word . . . UNION," sprinkling in various colorful epithets; his hostility was palpable throughout the meeting.

We are persuaded that there is substantial evidence for the Board to reasonably discern impermissible coercion. *See, e.g.*, *Timsco*, 819 F.2d at 1178 (upholding a Board determination that an interrogation of a non-union member was coercive based on the employer's statement that "union organizers were 'going to screw up a lot of jobs for a lot of people'"); *see also United Food & Commercial Workers Union Local 204*, 447 F.3d 821, 825 (D.C. Cir. 2006) ("[A]n employer's statement that union support would 'cause trouble' can put an employee in a 'defensive posture' and be unduly coercive under the right circum-

stances[.]" (quoting *Action Auto Stores, Inc.*, 298 N.L.R.B. 875, 901-02 (1990))).  Employees, having heard such statements in this context, on the heels of Randall's termination,[4] could reasonably perceive a direct connection between union activities and job loss.  *See H.B. Zachry Co.*, 319 N.L.R.B. 967, 969 (1995) (finding threat where employer's statement connected employee's union activity with discharge: "I terminated you yesterday. Your organizing days is [sic] over, boy."), *enforced in part sub nom. Int'l Bhd. of Boilermakers v. NLRB*, 127 F.3d 1300 (11th Cir. 1997).  According to Neeman, his statements simply reflected concern that Randall was badmouthing Progressive at job sites, potentially causing the company to lose work and, in turn, costing employees their jobs.  Although Neeman's explanation is plausible, "we must uphold the Board's findings as long as they rest upon reasonable inferences, and we may not reject them simply because other reasonable inferences may also be drawn."  *Tasty Baking*, 254 F.3d at 124-25.  We therefore cannot accept Progressive's argument on this point.

B

Progressive next challenges the finding that it violated Section 8(a)(1) by virtue of Hildreth's April 8, 1996 statements threatening facility closure.  Progressive's opening gambit—that Hildreth's statements did not violate the Act because they were simply an opinion protected by Section 8(c), 29 U.S.C. § 158(c)[5]—is not properly before us, having not been raised

---

[4] There is no suggestion that Randall's termination was itself a violation of the Act.

[5] This provision, which "merely implements the First Amendment," *Gissel Packing*, 395 U.S. at 617, states that "[t]he expressing of any views, argument, or opinion, or the dissemination

before the Board. *See id.* § 160(e); *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982); *Contractors' Labor Pool, Inc. v. NLRB*, 323 F.3d 1051, 1061 (D.C. Cir. 2003).

Progressive's followup salvo—that Hildreth was not its agent—also misfires. The Board applies common law principles of agency when assigning liability under the Act. *Overnite Transp. Co. v. NLRB*, 140 F.3d 259, 265 (D.C. Cir. 1998). Even if the "specific acts performed" have not been "actually authorized or subsequently ratified," 29 U.S.C. § 152(13), the employer will be bound by an individual having "apparent authority." *Overnite Transp.*, 140 F.3d at 265-66. As we have explained:

> "Apparent authority" exists where the principal engages in conduct that "reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." For there to be apparent authority, however, the third party must not only believe that the individual acts on behalf of the principal but, in addition, "either the principal must intend to cause the third person to believe that the agent is authorized to act for him, or he should realize that his conduct is likely to create such belief."

*Id*. at 266 (quoting Restatement (Second) of Agency § 27 & cmt. a (1992)).

---

thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c).

The Board finds apparent authority for an individual's actions, such as threatening retaliation for union activities, when the individual is placed "in a position where employees could reasonably believe that he spoke on behalf of management." *Indus. Constr. Servs., Inc.*, 323 N.L.R.B. 1037, 1039 (1997); *see Garvey Marine, Inc. v. NLRB*, 245 F.3d 819, 823-24 (D.C. Cir. 2001); *K.W. Elec., Inc.*, 342 N.L.R.B. No. 126, 2004 WL 2183528, at *19 (Sept. 24, 2004); *Triple H Elec. Co.*, 323 N.L.R.B. 549, 552 (1997); *GM Elecs.*, 323 N.L.R.B. 125, 125 (1997); *Delta Mech., Inc.*, 323 N.L.R.B. 76, 77-78 (1997). While we grant "only limited deference" to the Board's determination whether an individual was acting with apparent authority, "the standard of review is not *de novo*" as it is a factual matter that "cannot be disturbed if supported by substantial evidence on the record considered as a whole." *Garvey Marine*, 245 F.3d at 824 (quoting *Overnite Transp.*, 140 F.3d at 265) (internal quotation marks omitted).

The ALJ explained that Hildreth's statements were attributable to Progressive because

> [w]hen Cousins began working for [Progressive], Randy Neeman assigned Cousins to work with Hildreth whom Randy Neeman described as "running a few jobs for him." Randy Neeman told Cousins that if Cousins had any questions, he should ask Hildreth. Randy Neeman described Hildreth's duties as overseeing the projects. This manifestation by [Progressive] to employees created a reasonable basis for employees to believe that Hildreth was reflecting company policy and speaking for [Progressive].

*Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *11 (citing *GM Elecs.*, 323 N.L.R.B. at 128); *see also* Petitioner's Br. at 6 (acknowledging Hildreth was a "job foreman").

We have little difficulty concluding this is sufficient. Although there was some evidence to the contrary, the Board permissibly found a reasonable employee could believe from Neeman's actions that Hildreth spoke on behalf of management on April 8, 1996.[6]

IV

Next we examine the Board's conclusion that Progressive violated Sections 8(a)(3) and 8(a)(1) of the Act by failing to consider and hire the Union Applicants because of their union affiliation. Progressive contends this finding is not supported by substantial evidence. We disagree.

Under Section 8(a)(3), it is "an unfair labor practice for an employer . . . by discrimination in regard to hire or tenure of employment . . . to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). An employer violates this provision, and in turn Section 8(a)(1), by refusing to consider or hire job applicants on account of their union affiliation. *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 185-87 (1941); *Sw. Merch. Corp. v. NLRB*, 943 F.2d 1354, 1359 (D.C. Cir. 1991); *FES*, 331 N.L.R.B. at 12, *enforced*, 301 F.3d 83 (3d Cir. 2002). This protection extends even to applicants that are union "salts," or union members sent in "ostensibly to obtain employment but with the objective of inducing union organization." *Contractors' Labor Pool*, 323 F.3d at 1055, 1060; *see NLRB v. Town & Country Elec., Inc.*, 516 U.S. 85, 87 (1995); *Casino Ready Mix, Inc. v. NLRB*, 321 F.3d 1190, 1197 (D.C. Cir. 2003). We are, however, mindful that Congress "did not intend to make unlawful all acts that might have the effect of

---

[6] The Board has not asserted that Hildreth is a statutory supervisor under 29 U.S.C. § 152(11).

discouraging union membership" but instead "only those acts that are motivated by an antiunion animus." *Metro. Edison Co. v. NLRB*, 460 U.S. 693, 700 (1983).

To establish violations of Section 8(a)(3) in an antiunion animus case such as this, the General Counsel, per the Board's two-step *Wright Line* framework, has the initial burden to show that the "protected activity was a motivating factor in the adverse employment decision." *Int'l Union of Operating Eng'rs, Local 470 v. NLRB*, 350 F.3d 105, 110 (D.C. Cir. 2003) (internal quotation marks and citation omitted); *see Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir. 1981). More specifically, under the Board's test for refusal-to-hire violations, the General Counsel must establish:

> (1) that the [employer] was hiring, or had concrete plans to hire, at the time of the alleged unlawful conduct; (2) that the applicants had experience or training relevant to the announced or generally known requirements of the positions for hire, or in the alternative, that the employer has not adhered uniformly to such requirements, or that the requirements were themselves pretextual or were applied as a pretext for discrimination; and (3) that antiunion animus contributed to the decision not to hire the applicants.

*FES*, 331 N.L.R.B. at 12 (refining the *Wright Line* framework) (footnotes omitted). Similarly, under the Board's test for refusal-to-consider violations, the General Counsel must show "(1) that the [employer] excluded applicants from a hiring process; and (2) that antiunion animus contributed to the decision not to consider the applicants for employment." *Id.* at

15;[7] *see Int'l Union of Operating Eng'rs, Local 147 v. NLRB*, 294 F.3d 186, 189 (D.C. Cir. 2002). Then, once the General Counsel has made its initial showing, the burden shifts to the employer to show that it would not have considered or hired the applicants even in the absence of their union activity or affiliation. *FES*, 331 N.L.R.B. at 12, 15. As Progressive's arguments are essentially the same as to both the refusal-to-hire and refusal-to-consider violations, we will not distinguish between the two in our analysis.

A

Progressive first argues that substantial evidence is lacking to support the General Counsel's case because the Union Applicants were not applying during a time when Progressive was hiring. Although the ALJ found no evidence that Progressive was hiring on March 29, 1996, Progressive's argument misses the import of the Board's decision. By virtue of Neeman's deliberate misrepresentation and the events of the following year, the Board found an "overall scheme" of refusing to consider and hire the Union Applicants. *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *1 n.3. Given that several suitable positions opened up and were filled over that

---

[7] The Third Circuit, in upholding the Board's *FES* decision, found it unnecessary to reach the employer's argument that "the Board's refusal to consider doctrine . . . is an impermissible interpretation of § 8(a)(3) of the Act." *FES*, 301 F.3d at 96 n.7. *But cf. Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 975 (6th Cir. 2003) ("[T]he standard set forth in *FES* for 'refusal-to-consider' claims, as applied in this case by the [Board] . . ., is in conflict with our caselaw."). In the present case, Progressive has not challenged the Board's interpretation of the Act, *see* Petitioner's Br. at 23 (quoting Board's refusal-to-consider test), focusing instead on whether there is substantial evidence to uphold the Board's factual findings.

period, there *were* jobs available during the relevant time. *Cf. Fluor Daniel, Inc. v. NLRB*, 332 F.3d 961, 975 (6th Cir. 2003) ("[V]iolations of Section 8(a)(3) can only occur when an employer is hiring for the position(s) at issue."); *Bay Control Servs., Inc.*, 315 N.L.R.B. 30, 30 n.2 (1994).

The Board's finding is reasonable. On March 29, 1996, after Neeman accepted a sheet containing the Union Applicants' information, he lied to them, assuring them he would call them "as soon as [there is] an opening" when in fact he had no such intention. In the ALJ's words, this falsehood had the "effect of luring the applicants into complacency." *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *14; *cf. Commercial Erectors, Inc.*, 342 N.L.R.B. No. 94, 2004 WL 1967543, at *7 (Aug. 31, 2004) (explaining that applicants "reasonably would have [been] dissuaded . . . from coming to the site frequently" where employer assured them he would call them after calling others on employer's "master list"). The Board also pointed to various events over the course of the subsequent year, including the appearance of the notice in the window; the multiple Union letters, which Progressive received via fax but refused via certified mail; the decision to use blind advertisements; and the failure to hire the Union Applicants to any of the seven suitable positions that became available. While we doubt any of these actions—including the initial misrepresentation—would be independently sufficient, the Board reasonably found they were collectively "part and parcel of [Progressive's] overall scheme to refuse to consider and hire" the Union Applicants. *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *1 n.3.

Progressive's proffer of a 45-day application period is also unavailing, regardless of whether it normally employed such a retention policy. Having deliberately sought to divert the Union Applicants from its normal hiring process, Progressive cannot

now take refuge therein. Nothing in Neeman's statements on March 29, 1996, would have alerted the Union Applicants of an expiration date or of the need to take further action. *See Fluor Daniel,* 332 F.3d at 970 (noting that the Board found the employer "failed to advise the discriminatees that the period for which their application would be valid had changed" and that the "applications themselves lacked such notification"); *Commercial Erectors*, 342 N.L.R.B. No. 94, 2004 WL 1967543, at \*6 (finding that employer, having promised to call when something opened up, failed to tell applicants they needed to take further affirmative steps to comply with employer's gate hiring policy). Nor did Progressive respond to the various follow-up letters that expressed the Union Applicants' continuing interest in employment and asked that Neeman inform them if any further efforts were needed for them to be considered. It was not until April 4, 1997, that Progressive came clean and informed the Union Applicants they actually were not being—and had never been—considered.[8]

Contrary to Progressive's suggestion, the Board nowhere indicates that employers must *favor* union applicants. *See Phelps Dodge*, 313 U.S. at 186. We readily acknowledge that the Board is not authorized to function as a "ubiquitous 'personnel manager,'" and, indeed, "[i]t is well recognized that an employer is free to lawfully run its business as it pleases." *Detroit Newspaper Agency v. NLRB*, 435 F.3d 302, 310 (D.C. Cir. 2006) (quoting *Epilepsy Found. of Ne. Oh. v. NLRB*, 268 F.3d 1095, 1105 (D.C. Cir. 2001)); *see Phelps Dodge*, 313 U.S. at 187 (explaining that the Act "does not touch 'the normal exercise of

---

[8] While the passage of time might at some point make it unreasonable for the Board to discern an "overall scheme" from a series of attenuated events, the Board reasonably took a different view in this case given the totality of the circumstances.

the right of the employer to select its employees or to discharge them'" (quoting *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 45 (1937))). The Board, too, routinely acknowledges the employer's discretion to set its own non-discriminatory hiring practices. *E.g.*, *Watkins Eng'rs & Constructors, Inc.*, 333 N.L.R.B. 818, 818 n.6 (2001) ("[T]here is no basis for finding a violation with respect to union members who failed to comply with the [employer's] hiring procedures."); *see also Dalton Roofing Serv., Inc.*, 344 N.L.R.B. No. 108, 2005 WL 1492881, at *5 (June 21, 2005) (applications to be completed on the employer's premises); *C.T. Taylor Co.*, 342 N.L.R.B. No. 102, 2004 WL 2053015, at *15 (Sept. 10, 2004) ("two-step hiring process" whereby job seekers were required to fill out applications and then to follow up with a phone call to request an interview); *Indus. Constr. Servs.*, 323 N.L.R.B. at 1040 (applications not accepted via fax); *Delta Mech.*, 323 N.L.R.B. at 80-81 (applications not accepted when no positions available); *Bay Control Servs.*, 315 N.L.R.B. at 35, 37 ("gate hiring" practice, preferring applicants "standing at the gate" over past applicants); *Int'l Union of Operating Eng'rs, Local 150*, 325 F.3d 818, 830 n.17 (7th Cir. 2003); *cf. Starcon, Inc.*, 323 N.L.R.B. 977, 982 (1997), *enforced in part*, 176 F.3d 948 (7th Cir. 1999). This does not mean, however, that the Board will allow employers to toy with union job seekers by deliberately misdirecting and excluding them.

B

Whether there is sufficient evidence to conclude Progressive was motivated by antiunion animus is a closer question. "Motive is a question of fact, and the [Board] may rely on both direct and circumstantial evidence to establish an employer's motive, considering such factors as the employer's knowledge of the employee's union activities, the employer's hostility

toward the union, and the timing of the employer's action." *Power, Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir. 1994). "[O]ur review of the Board's motive determinations, including inferences of improper motive drawn from the evidence, is especially deferential." *Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 31 (D.C. Cir. 1998); *see Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005); *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000).

There are, of course, limits to our deference. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951); *Epilepsy Found. of Ne. Oh.*, 268 F.3d at 1103. For example, in *TIC*, we held that a "showing of animus requires greater proof than a single comment by a supervisor to the effect that the company preferred to hire non-union personnel" and that "[t]he mere fact that the [employer] knew the applications were from Union applicants does not show animus." 126 F.3d at 338; *see also Detroit Newspaper Agency*, 435 F.3d at 310; *BE & K Constr. Co. v. NLRB*, 133 F.3d 1372, 1376 (11th Cir. 1997) ("[W]e will not allow the Board to punish an employer simply because that employer is anti-union."). We also noted that a prohibited motive will not be inferred "where job applicants fail to follow regularly applied, facially neutral application procedures." *TIC*, 126 F.3d at 338.

The record before us, however, permits a finding that the actions in question were motivated by antiunion animus. The evidence, appropriately centered on Neeman as the decisionmaker in personnel matters,[9] includes his deliberate

---

[9] *Compare Commercial Erectors*, 342 N.L.R.B. No. 94, 2004 WL 1967543, at \*6-7 (finding violation based on actions of job supervisor where he "was in complete charge of hiring"), *with Brown & Root Indus. Servs.*, 337 N.L.R.B. 619, 619 (2002) (finding no improper

misrepresentation to the Union Applicants on March 29, 1996, and his admission that he never intended to hire them;[10] the timing of his placing the notice in the window on April 2, as a "result of the [Union Applicants] appearing with video cameras and a recording device," *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *14;[11] his overt hostility at the May 1 meeting;[12] and his failure to contact or hire any of the Union

---

motivation where there was no "nexus" between the employer's hiring decision and the statements of a "supervisory foreman" who "had no role in processing" the applications in question).

[10] *See Int'l Union of Operating Eng'rs, Local 147*, 294 F.3d at 190 (where employer "falsely told each of the applicants 'there was no work available' rather than telling them they were locked out," Board could infer from this "misrepresentation" that employer had "unlawful motive"); *Commercial Erectors,* 342 N.L.R.B. No. 94, 2004 WL 1967543, at *5 (basing animus on, inter alia, employer's "promise[] to call [job seekers] . . . as soon as he had opening" but where he "never had any intention of hiring them"); *cf. Sw. Merch.*, 943 F.2d at 1362. To be sure, while the Board might well have seen Neeman's actions on March 29 as little more than an innocuous attempt to rid the office of unwanted guests, the Board reasonably thought otherwise.

[11] *See Power*, 40 F.3d at 418.

[12] *See Power*, 40 F.3d at 418 ("[T]he Board was entitled to rely on [a company official's] anti-union statements as evidence of anti-union motivation, even though [his] statements, made in private conversations to [the office manager], were not themselves unlawful."); *John W. Hancock, Jr., Inc.*, 337 N.L.R.B. 1223, 1224 n.8 (2002) ("Under extant Board law . . . noncoercive statements may, in limited circumstances, be used as evidence of an unfair labor practice."), *enforced*, 73 Fed. Appx. 617 (4th Cir. 2003) (unpublished); *Tualatin Elec., Inc.*, 319 N.L.R.B. 1237, 1239, 1241

Applicants over the time period in question.[13] Furthermore, that Neeman's actions at the May 1 meeting were themselves found to be an unfair labor practice in the form of a threat, as discussed above, is yet more fuel to the fire. *Frazier Indus. Co., Inc. v. NLRB*, 213 F.3d 750, 756 (D.C. Cir. 2000); *Power*, 40 F.3d at 418. In the aggregate, refracted through our deferential lens, the Board's inference of animus meets the minimum threshold of reasonableness. The contrary evidence—such as Neeman's friendly relationships with union members, his hiring of a small number of union members in the past, and his comments in the May 1 meeting indicating that employees were free to decide whether to participate in union activities—does not compel a contrary conclusion in this case. Further, the Board does not suggest that, having found an illegal motivation for an adverse action, an employer risks liability for all subsequent adverse decisions as to the same individuals, regardless of how far in the future, with no further showing of animus. *Cf. Richardson v. Sugg*, 448 F.3d 1046, 1058 (8th Cir. 2006) (holding, in Title VII case, that "the span of time between [an employer's racially-charged] remarks and the decision to fire [the plaintiff] [is] relevant to a determination of whether discriminatory animus motivated the firing"); *BE & K Constr.*, 133 F.3d at 1376 n.10

---

(1995) (owner evinced "deep hostility" toward union, calling it "organized crime"); *see also United Food & Commercial Workers*, 447 F.3d at 825 (holding that stating "I'm just tired of this Union shit and I'm ready to get my company back where it belong[s]" two days before firing a union election observer "exhibits powerful antiunion animus"). *But see Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 639 n.7 (5th Cir. 2003) ("A lawful statement of a lawful position does not in itself allow inference that one is willing to enforce that position through illegal means.").

[13] *See Commercial Erectors,* 342 N.L.R.B. No. 94, 2004 WL 1967543, at *5.

("Given that there is no evidence linking such past [labor violations] to any present anti-union animus of [the employer], we find the past transgressions too remote in time to be relevant to this dispute."); *Oil Capital Elec.*, 337 N.L.R.B. 947, 948 (2002) (declining to infer that a refusal to hire was improperly motivated given that the only evidence of animus was an interrogation that occurred more than two months later).

C

Finally, Progressive argues that, even if the General Counsel's initial showing was sufficient, Progressive met its burden to demonstrate it would not have considered or hired the Union Applicants even in the absence of their union affiliation. Progressive advances three defenses: (1) the Union Applicants were overqualified;[14] (2) some of the Union Applicants were employed by Progressive's competitors; and (3) the Union Applicants were not legitimate applicants for employment. We find substantial evidence for the Board's conclusion that Progressive failed to carry its burden.

As the Board correctly observes, the first two arguments rest on the "unremarkable proposition that an employer can apply neutral criteria and hiring procedures to job applicants without regard to union affiliation." Respondent's Br. at 42; *see, e.g.*, *Dalton Roofing Serv.*, 344 N.L.R.B. No. 108, 2005 WL 149288-1, at *4 (employer can use wage history as neutral factor in determining whether applicants are overqualified); *Bay Control*

---

[14] Progressive does not argue in its petition that the Union Applicants were *under*qualified for any of the positions—except for the HVAC position, which the Board acknowledged would not have been suitable for any of them. *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *1 n.2.

*Servs.*, 315 N.L.R.B. at 30 (employer had policy of rejecting overqualified applicants); *Wireways, Inc.*, 309 N.L.R.B. 245, 245-53 (1992) (employer gave preference to applicants whose desired wages were comparable to its budgeted wages); *Willmar Elec. Serv. Inc.*, 303 N.L.R.B. 245, 246 n.2 (1991) ("An employer may . . . lawfully refuse to hire a statutorily protected employee applicant . . . on the basis of a nondiscriminatory policy against hiring any individual who . . . applies while working for another employer . . . ."), *enforced*, 968 F.2d 1327 (D.C. Cir. 1992).  We reject Progressive's first defense, as Progressive makes no effort to show it actually had a policy of rejecting overqualified applicants.  In any case, the ALJ discredited Neeman's testimony that Progressive had such a policy and we are offered no basis for upsetting that determination.  *Cf. TIC*, 126 F.3d at 334 ("Where a company has consistently followed neutral guidelines, and does so in the case in question, it has met its burden of showing it would have refused to consider applications that deviated from the normal procedure.").  And contrary to Progressive's suggestion, there is no indication the Union Applicants were unwilling to accept positions beneath their skill level, having expressed a general interest in being "considered for employment."  Progressive's second defense—that it has a policy of not hiring competitors' employees—is not properly before us, having not been urged before the Board.  29 U.S.C. § 160(e).

Progressive's third defense—that the Union Applicants "who came to [Progressive] armed with a video camera were not involved in an activity that was protected by the Act because they were not truly seeking employment," Petitioner's Br. at 21—also falls short.[15]  Progressive acknowledges that, under

---

[15] Insofar as Progressive also raises this issue to argue that it was not improperly motivated in declining to hire and consider the Union

well-established Board precedent, "individuals seeking jobs from an employer pursuant to a union's 'salting' program are statutory employees entitled to protections under the Act." *Casino Ready Mix*, 321 F.3d at 1197; *see Town & Country Elec.,* 516 U.S. at 87. "[E]ven when a salting campaign is intended in part to provoke an employer to commit unfair labor practices, union organizers retain their status as employees." *Casino Ready Mix*, 321 F.3d at 1197. Nonetheless, Progressive asserts that, regardless of the Union Applicants' union affiliation, Progressive would not have hired anyone exhibiting such behavior—behavior indicating "they were not interested in working hard for [Progressive]." Petitioner's Br. at 22.

In raising the Union Applicants' bona fides as a defense, Progressive marshals only an ALJ opinion that has been specifically disavowed in relevant part by the Board. *See W.D.D.W. Commercial Sys. & Invs., Inc.*, 335 N.L.R.B. 260, 263-65 (2001), *enforced in relevant part sub nom. Contractors' Labor Pool*, 323 F.3d at 1060-61; *accord A. Montano Elec.*, 335 N.L.R.B. 612, 614 & nn.9-10 (2001). Equally curious is Progressive's passing citation to a Sixth Circuit opinion that was superseded by a subsequent opinion. *See NLRB v. Fluor Daniel, Inc.*, 102 F.3d 818, 832 (6th Cir. 1996), *superseded by* 161 F.3d 953 (6th Cir. 1998). We are underwhelmed.

Although Progressive might find it unpalatable that applicants furthering their own agenda without regard for Progressive's well-being stand on equal footing with job seekers who are just seeking jobs, the Board does not perceive anything problematic *per se* with a salting effort that involves a group of union members (often called "batch applicants") arriving en

Applicants, and that they are not even "employees" within the meaning of the Act in the first place, it is equally unavailing.

masse with a video camera and pursuing employment. *See, e.g.*, *Heiliger Elec. Corp.*, 325 N.L.R.B. 966, 967 (1998) ("Such group activity normally enjoys the full protection of the Act."); *Braun Elec. Co.*, 324 N.L.R.B. 1, 3 (1997) ("[V]isiting the [employer's] office to present employment applications, videotaping the employment application encounter, and filing an unfair labor practice charge . . . constitutes protected activity").[16] It is a dance that has been repeated on several occasions, *see, e.g.*, *FES*, 301 F.3d at 85, and there is no indication that the steps are different in the present case. The Board, while highlighting one Member's sympathy for Progressive's position, acknowledged the futility of the argument under current Board precedent. *Progressive Elec.*, 344 N.L.R.B. No. 52, 2005 WL 762117, at *1 n.2 (noting the "absence of a three-member majority of the Board willing to revisit the parameters of applicant status under *FES*").

It is true the Board has recognized that, under certain circumstances, an employer can justify its refusal to hire by showing the applicant has a "disabling conflict." *See Contractors' Labor Pool*, 323 F.3d at 1060 (noting that the "Board likened a disabling conflict defense to a *Wright Line* defense"); *Sunland Constr. Co.*, 309 N.L.R.B. 1224, 1230 (1992) (noting that employer in certain circumstances need not "hire a paid organizer whose role is inherently and unmistakably inconsistent with employment" (internal quotation marks omitted)). In that vein, the Board has indicated that "'salting' . . . may be found to be unprotected if the purported organizational activity is a subterfuge used to further purposes unrelated to organizing, undertaken in bad faith, designed to result in sabotage, or

---

[16] In *Heiliger Elec.* and *Braun Elec.,* the Board did not find the videotaping *itself* to be a protected activity. *Heiliger Elec.*, 325 N.L.R.B. at 966 n.3; *Braun Elec.*, 324 N.L.R.B. at 3 n.4.

designed to drive the employer out of the area or out of business." *Casino Ready Mix*, 321 F.3d at 1198 (citing *Braun Elec.*, 324 N.L.R.B. at 3 n.3; *M.J. Mech. Servs.*, 324 N.L.R.B. 812, 813-14 (1997)). Whatever the exact contours of a "disabling conflict," we have little difficulty upholding the Board's refusal to find one here, given the paucity of evidence suggesting this salting effort is anything other than ordinary. *See Contractors' Labor Pool*, 323 F.3d at 1061 ("An employee does not lose his protected status *merely* because he is a salt. Rather, he may lose it if he engages in unprotected activity that emanates from disabling conflicts arising in connection with salting.").

The Board has also previously found that where "the overall environment created by the applicants" in attempting to gain employment was "sufficiently intimidating and disrespectful," an employer is "privilege[d] . . . to not hire" them. *Heiliger Elec. Corp.*, 325 N.L.R.B. at 966 n.3. In *Heiliger Electric*, for example, the Board determined that an employer was justified in refusing to hire applicants who refused to leave when asked, refused to stop videotaping when asked, and videotaped personal and private papers on the employer's desk. *Id.* at 968. In the present case, the Board reasonably declined to find any such disruption. *See Commercial Erectors, Inc.*, 342 N.L.R.B. No. 94, 2004 WL 1967543, at *7 & n.9 (finding applicants "at no time engaged in disruptive, intimidating, or disrespectful behavior," and distinguishing *Heiliger Electric*). Indeed, at no point did Neeman ask the Union Applicants to leave or to stop recording.

In short, Progressive offers us insufficient reason to disturb the Board's findings as to the refusal-to-hire and refusal-to-consider violations.

28

V

For the foregoing reasons, we deny Progressive's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*