# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 12, 2011          Decided August 5, 2011

No. 10-1309

BALLY'S PARK PLACE, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,
UAW,
INTERVENOR

---

Consolidated with 10-1356

---

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

---

*Judith Sadler* argued the cause for petitioner. With her on the briefs was *Charles E. Sykes*.

*Zachary R. Henige*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda*

*Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Cassie Ehrenberg* and *Blair Katherine Simmons* were on the brief for intervenor.

Before: SENTELLE, *Chief Judge*, and GINSBURG and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:  Bally's Park Place, Inc. petitions for review of a decision and order of the National Labor Relations Board (NLRB).  The Board found that the company committed unfair labor practices in violation of sections (8)(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (3), when it discharged employee Jose Justiniano because of his support for the United Auto Workers. For the reasons set forth below, we deny Bally's' petition and grant the Board's cross-application for enforcement of its order.

I

Bally's operates a casino in Atlantic City, New Jersey.  The company hired Justiniano as a table dealer in 2000, and through 2006 it repeatedly praised him as a good employee.  *See* Dealer Evaluation Forms (J.A. 367-69).  In November of that year, the United Auto Workers (UAW) began a campaign to organize casino dealers in the Atlantic City area, including those working at Bally's.  Justiniano attended numerous meetings held by the union, became a supporter, and signed an authorization card.  He spoke to other Bally's employees on a daily basis about the need for a union -- in the employees' lounge, in the cafeteria, and as they were coming to and going from work.  He also appeared in

a promotional video that the union prepared and mailed to casino workers in and around Atlantic City.[1]

In January 2007, at a time when no customers were present at his table, Justiniano spoke to another employee about the union's organizing efforts. It is undisputed that Bally's allowed dealers to have social conversations in such circumstances. Nonetheless, Justiniano's supervisor told the two that they could not talk about the union while on the casino floor.

On March 19, 2007, Justiniano got into a dispute with a manager over break time. When the supervisor threatened to discipline him, Justiniano responded that such threats were the reason the employees needed a union. The manager then began yelling at him, saying that he was not allowed to talk about "union" on the casino floor and that he could be "fired for talking about unions." *Bally's Park Place, Inc.*, 355 N.L.R.B. No. 218, at 7, 2010 WL 3835565 (Sept. 30, 2010) (ALJ Op.). A short while later, Justiniano was instructed to report to another supervisor, who told him that he was "not allowed to talk about the Union on the casino floor whatsoever." *Id*. And on March 22, Justiniano was escorted to speak to the shift manager, who asked him about the previous incident. The shift manager told Justiniano that he should not talk about the union on the casino floor and issued him a written warning for acting "in an unprofessional manner." *Id*.

In late March or early April, Justiniano was talking with other employees in the employee cafeteria when a Bally's floor person told them that she and other supervisors had just had a meeting with "higher up management." *Id*. She said they were

---

[1]The facts set forth in Part I of this opinion are taken from the decisions of the Board and the Administrative Law Judge, and are not disputed on this appeal.

asked "the best way we can satisfy dealers" so they would not join the union. *Id.* Justiniano told her there was nothing to do because the "damage is already done." *Id.*

On March 31, Justiniano was scheduled to work at the casino from 12:00 noon to 8:00 p.m. The night before his shift, the mother of his 13-year-old daughter called and asked him to take care of the girl beginning at 12:30 p.m. the next day. Justiniano's daughter suffered from severe asthma that required treatment every four hours. He had previously taken leave to care for her, without incident, pursuant to the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* Justiniano called Bally's at 6:00 a.m. on the morning of March 31 and left a message that he would be taking FMLA leave that day; he called back at 9:00 a.m. to confirm that Bally's had received the message.

Later that morning, the UAW held a rally outside the Trump Plaza casino as part of its effort to organize Atlantic City casino dealers. The rally was scheduled to last from 10:30 a.m. until about 12:15 p.m. Justiniano attended the rally and waved a "Union Yes" sign. On his way to work, one of Bally's' managers saw Justiniano holding the sign. Upon arriving at the casino, the manager informed Bally's' vice president of table games, Michael May, that he had just seen Justiniano at the rally. May responded that Justiniano had requested FMLA leave for the day.

When Justiniano returned to work, he signed a form requesting paid family leave for his entire shift on March 31. On April 9, May took Justiniano to meet with Bally's' director of operations, Richard Tartaglio. Tartaglio informed Justiniano that he had been seen at the UAW rally on the morning of March 31, and he asked Justiniano when he left the rally. Justiniano acknowledged that he was at the rally until it ended

at about 12:20 p.m.,[2] and said that he had then gone home to care for his daughter. Based on the information Justiniano provided, Tartaglio and May concluded that Justiniano had been at the rally for 20 minutes after the start of his scheduled shift and that he had therefore spent 20 minutes of FMLA leave time attending the rally. On April 12, Bally's terminated Justiniano for "violation of Work Rule Number 3 in the employee handbook stating that employees will be honest and forthcoming in all communication." 355 N.L.R.B. No. 218, at 2 (Board Op.).

Following Justiniano's termination, the UAW filed unfair labor practice charges against Bally's. Based on those charges, the NLRB's General Counsel issued a complaint alleging that the company had violated sections 8(a)(1) and (3) of the NLRA, which (inter alia) make it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" their rights to form, join, or assist labor organizations, 29 U.S.C. § 158(a)(1), and "by discrimination in regard to . . . tenure of employment . . . to encourage or discourage membership in any labor organization," *id.* § 158(a)(3). The complaint alleged that Bally's violated section 8(a)(1) by instructing Justiniano that he could not talk about the union on the casino floor, and by soliciting employees' grievances and promising them improved conditions if they refrained from supporting the union. The complaint also alleged that Bally's violated sections 8(a)(1) and (3) by terminating Justiniano for engaging in union activity.

The Administrative Law Judge (ALJ) found that Bally's violated section 8(a)(1) by telling Justiniano -- once in January

---

[2]Justiniano denied that he had said this, but the Administrative Law Judge accepted the testimony of Tartaglio and May on this point, *see* 355 N.L.R.B. No. 218, at 10 (ALJ Op.), and the Board accepted the judge's credibility determination, *id.* at 1 n.1 (Board Op.).

and three times in March, 2007 -- that he could not discuss union issues on the casino floor even though employees were permitted to discuss other nonwork-related matters there. 355 N.L.R.B. No. 218, at 7-8 (ALJ Op.) (citing, e.g., *ITT Indus.*, 331 N.L.R.B. 4 (2000)). The judge also found that the floor person's inquiry as to how management could "satisfy dealers" so they would not join the union constituted an implicit promise to remedy dealers' grievances if they did not join. This too, the ALJ held, violated section 8(a)(1). *Id*. at 8 (citing *Traction Wholesale Ctr. Co*., 328 N.L.R.B. 1058 (1999)).

But the ALJ dismissed the General Counsel's allegation that Bally's violated sections 8(a)(1) and (3) by discharging Justiniano. *Id.* at 9-10. Applying the familiar *Wright Line* test, the judge first found that the General Counsel had established a prima facie case that Bally's discharged Justiniano because of his union activity. *Id.* at 9 (citing *Wright Line*, 251 N.L.R.B. 1083 (1980)). The judge noted that it was undisputed that Bally's was aware of Justiniano's support for the union, that Justiniano was discharged shortly after he was seen attending a union rally on March 31, and that the "timing of an employer's action can be persuasive evidence of its motivation." *Id*. (citing, e.g., *Masland Indus.*, 311 N.L.R.B. 184, 197 (1993)). The judge also determined that the section 8(a)(1) violations he had found constituted further "evidence of animus on respondent's part." *Id*.

Nonetheless, the ALJ concluded that Bally's had satisfied its rebuttal burden, under *Wright Line,* to show that it would have discharged Justiniano in the absence of his union activity. The judge found that Bally's had a "zero-tolerance policy" with respect to employees who abused FMLA leave by using it for something other than that for which they had requested the leave. And he concluded that Bally's discharged Justiniano for "abus[ing] the FMLA leave he had requested to care for his

daughter by using at least 20 minutes of such leave to attend the UAW rally on March 31." *Id*. at 10.

The UAW and the General Counsel appealed the ALJ's decision to the Board. Bally's did not except to the ALJ's findings that it violated section 8(a)(1) by telling Justiniano not to talk about the union and by soliciting grievances and promising to remedy them in order to dissuade employees from supporting the union. The Board therefore adopted those findings. The Board disagreed, however, with the ALJ's determination that Bally's did not violate sections 8(a)(1) and (3) when it discharged Justiniano. To the contrary, the Board determined that Bally's failed to meet its *Wright Line* burden of showing that it would have discharged Justiniano absent his protected conduct. 355 N.L.R.B. No. 218, at 3 (Board Op.).

Bally's now petitions for review of that determination.[3]

II

This court "accords a very high degree of deference to administrative adjudications by the NLRB." *United Steelworkers of Am. v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993). When the Board concludes that a violation of the NLRA has occurred, we must uphold that finding unless it "has no rational basis" or is "unsupported by substantial evidence." *United Mine Workers of Am., District 31 v. NLRB*, 879 F.2d 939, 942 (D.C. Cir. 1989) (internal citations omitted). "It is not necessary that we agree that the Board reached the best outcome

---

[3]Bally's does not contest the Board's determination that it committed the section 8(a)(1) violations found by the ALJ, and the Board is therefore entitled to summary enforcement as to that part of its order. *See Flying Food Group, Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006).

in order to sustain its decisions. The Board's findings of fact are 'conclusive' when supported by substantial evidence on the record considered as a whole." *United Steelworkers*, 983 F.2d at 244 (citing 29 U.S.C. § 160(e)). Indeed, "the Board is to be reversed only when the record is 'so compelling that no reasonable factfinder could fail to find' to the contrary." *Id*. (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).[4]

With the blessing of the Supreme Court (and this court), the Board employs the *Wright Line* test when reviewing a claim that an employer discharged (or took other disciplinary action against) an employee for protected conduct. *See Wright Line*, 251 N.L.R.B. at 1089; *see also NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401-03 (1983) (approving the *Wright Line* test). "Under that test, the General Counsel must first 'make a prima facie showing sufficient to support the inference that protected . . . conduct was a motivating factor in the [discharge].'" *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125 (2001) (quoting *TIC-The Indus. Co. Southeast v. NLRB*, 126 F.3d 334, 337 (D.C. Cir. 1997)). "Once a prima facie case has been established, the

---

[4]We also note that, "[w]here the Board has disagreed with the ALJ, as occurred here, the standard of review with respect to the substantiality of the evidence does not change." *Local 702, Int'l Bhd. of Elec. Workers v. NLRB*, 215 F.3d 11, 15 (D.C. Cir. 2000) (internal quotation marks omitted); *see Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951) (holding that "the 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree"). Although "the Board, when it disagrees with the ALJ, must make clear the basis of its disagreement," in the end it is the Board that is "entrusted by Congress with the responsibility for making findings under the statute." *Local 702*, 215 F.3d at 15 (internal quotation marks omitted). "It is not precluded from reaching a result contrary to that of the [ALJ] when there is substantial evidence in support of each result, and is free to substitute its judgment for the [ALJ]'s." *Id*. (internal quotation marks omitted).

burden [of persuasion] shifts to the company to show that it would have taken the same action in the absence of the unlawful motive." *Id.* at 126; *see Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1135 (D.C. Cir. 2003).

Bally's does not challenge the Board's conclusion that the General Counsel established a prima facie case of discriminatory motive. And for good reason. As Bally's well knew, the union was attempting to organize its employees and Justiniano was an outspoken union supporter. Its managers had unlawfully instructed him on three recent occasions not to discuss the union with other employees on the casino floor. Indeed, one manager threatened that he could be "fired for talking about unions," and he was given a written warning. 355 N.L.R.B. No. 218, at 1 (Board Op.). A supervisor had also unlawfully solicited his grievances with the implied promise to remedy them if he refrained from supporting the union. Justiniano's discharge came less than three weeks after the firing threat, even closer in time to the unlawful solicitation, and within days of a manager observing him at a pro-union rally. As the Board rightly found, this "evidence of a discriminatory motive is strong." *Id*. at 3. *See, e.g.*, *Tasty Baking Co.*, 254 F.3d at 125-26 ("In determining whether the employer had a discriminatory motive, the NLRB may 'consider[] such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action.'" (quoting *Power Inc. v. NLRB*, 40 F.3d 409, 418 (D.C. Cir. 1994))).

Where, as here, the General Counsel makes a strong showing of discriminatory motivation, the employer's rebuttal burden is substantial. *See Eddyleon Chocolate Co.*, 301 N.L.R.B. 887, 890 (1991); *see also Van Vlerah Mech., Inc.*, 320 N.L.R.B. 739, 746 (1996). Bally's argues that it met that burden by demonstrating that it maintained a "zero-tolerance" policy with respect to the misuse of family leave time. As the Board

noted, however, Bally's had no written zero-tolerance policy, and there is no evidence that it ever announced such a policy to its employees. 355 N.L.R.B. No. 218, at 3 (Board Op.).

Bally's contends that it was error for the Board to insist on a formal written or oral policy, arguing that the Board's "imposition of a requirement that Bally's policy affirmatively state that leave can only be used for reasons listed in the [FMLA] statute in order to discharge an employee . . . is unreasonable and contrary to the statutory provisions of the FMLA." Pet. Br. 24. But Bally's badly misreads the NLRB's decision. The Board did *not* state that a company must have a written (or oral) policy in order to discharge an employee for a single leave violation, only that the absence of a writing weakened its claim to have such a policy. *See, e.g.*, *Ross Stores Inc. v. NLRB*, 235 F.3d 669, 675 (D.C. Cir. 2001) (stating that the Board's finding, that the employer "had no rule requiring that time off be scheduled in advance," was "supported in the record by the absence of any such rule from [the employer's] written time-off policies").

Moreover, Bally's' problem is not just that it lacked a written rule that supported its claim of zero tolerance for misstatements regarding leave. Rather, the written policy that Bally's did have -- and upon which it relied as the justification for Justiniano's discharge -- actually contradicted that claim. Although Bally's had no work rule specifically relating to leave time, it did have a work rule (Work Rule 3) that said, "Employees will be honest and forthcoming in all communication, verbal and written." Bally's Atlantic City Employee Handbook, Rules of the Road ¶ 3 (J.A. 370). Bally's maintained before the NLRB, and repeats on appeal, that it "discharged Justiniano for violating Bally's Work Rule 3." Pet. Br. 26; *see* 355 N.L.R.B. No. 218, at 2 (Board Op.); *id*. at 8 (ALJ Op.).

But Bally's' "Rules of the Road" did not establish a zero-tolerance policy pursuant to which an employee would be fired for even the most minor violation of a work rule. To the contrary, the Rules stated:

> Although . . . violation[] [of the work rules] noted below may result in immediate Separation of Employment . . . upon first offense, less severe offenses are viewed cumulatively and will normally be handled on a four-step basis of progressive discipline:
>
> - First Step -- Documented Coaching
> - Second Step -- Written Warning
> -Third Step -- Final Warning
> - Fourth Step -- Separation of Employment.

Rules of the Road, Conduct Standards, at 2.16 (J.A. 370). Work Rule 3 was one of the work rules noted. But so also were many others, including rules prohibiting employees from: harassing guests or coworkers on the basis of sex, race, or religion; participating in theft, misappropriation, misuse, or willful destruction of co-workers' or company property; reporting to work under the influence of drugs or alcohol; selling drugs; and coercing, threatening, colluding with, or using physical force toward co-workers, vendors, or others. *See* Rules of the Road ¶¶ 1-35 (J.A. 370-72). It is hardly unreasonable to conclude that, under a progressive discipline policy that applies to these kinds of violations and pursuant to which discharge is "normally" reserved for the more severe offenses, the employer would not fire an employee simply for improperly taking (and misrepresenting) 20 minutes of leave time.[5] Indeed, as the

---

[5]*See Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 31 (D.C. Cir. 1998) (stating that the employer must "prove . . . that despite any

Board points out, testimony at the ALJ hearing revealed that in 2007 Bally's suspended for one day, but did not fire, two employees who violated Work Rule 3 (albeit outside of the leave context). Hr'g Tr. at 276-78 (J.A. 290-92). Under these circumstances, it is a reasonable inference that Bally's' reliance on Work Rule 3 was a pretext for discriminatory motive.[6]

As the Board notes, Bally's' claim to have a zero-tolerance policy ultimately rests entirely on its anecdotal evidence regarding nine employees whom it says it discharged for misuse of family or medical leave. As the Board found, however, those nine cases are distinguishable from Justiniano's situation. In the great majority, "the entirety of the requested leave was used for an improper purpose." 355 N.L.R.B. No. 218, at 3. One employee, for example, sought leave purportedly to care for a serious health condition, but in fact used it to work at a competing casino and avoid being docked for tardiness at Bally's. Another sought medical leave for a health problem, but used the leave to perform construction work. Two employees requested intermittent family leave, but were fired when Bally's discovered they were using the time to operate a canoe rental business. And yet another sought a three-month medical leave, claiming that he could not work because of severe osteoarthritis, but instead was found operating a massage parlor.

---

anti-union animus, [it] *would* have fired [the employee], not that it *could* have done so").

[6]*See Cadbury Beverages*, 160 F.3d at 31-32 (holding that it was "not incumbent on the general counsel to prove, nor on the Board to find, that the company's asserted nondiscriminatory reason of insubordination was pretextual[,] . . . although such a showing would have served as a conclusive rejection of [the company's] affirmative defense").

13

As the Board reasonably concluded, "at most, this evidence establishes that the Respondent had a practice of terminating employees who fraudulently requested or extended FMLA leave, i.e., telling the Respondent that they required leave to fulfill family responsibilities or out of medical necessity and then using the leave for a completely different purpose." 355 N.L.R.B. No. 218, at 4. By contrast, "Justiniano did not intentionally and fraudulently request FMLA leave for a purpose not covered by the FMLA." *Id.*[7]

Bally's offers only two examples of employees who, like Justiniano, used some but not all of their FMLA leave time for its intended purpose. One requested leave to care for her ailing father, but then failed to return to work for a month after her

---

[7]Bally's points out that, after discharging Justiniano, it learned that he had not only failed to use his FMLA leave to care for his daughter for 20 minutes at the beginning of his shift, but that he had also failed to use it for that purpose after 5:30 p.m., when his daughter returned to her mother's home. As the Board correctly noted, however, because Bally's did not know this when it terminated Justiniano, it is not relevant to the company's motive for discharging him. 355 N.L.R.B. No. 218, at 2 n.6; *see Cadbury Beverages*, 160 F.3d at 32 n.7 (holding that "the relevant belief is the belief that the company had at the time it fired [the employee]; that [the company] can show a reasonable basis for having fired [him] now is . . . unavailing if, at the time, [the company] was motivated only by antiunion animus"). Although late-discovered misconduct is relevant to whether the Board can order reinstatement or front pay, *see Frazier Indus. Co., Inc. v. NLRB*, 213 F.3d 750, 760 (D.C. Cir. 2000), we cannot consider such a claim because Bally's did not challenge the Board's remedy on that ground below, *see* 29 U.S.C. § 160(e); *see also W & M Props. of Conn., Inc. v. NLRB*, 514 F.3d 1341, 1345 (D.C. Cir. 2008) ("If aggrieved by the Board's remedy, W & M should have filed a petition for reconsideration pursuant to the Board's rules and regulations.").

father died.  The other requested leave to attend to his wife who, he claimed, required constant care.  After an investigation, however, Bally's discovered that he was operating a bed-and-breakfast with his wife.  These employees are also reasonably distinguishable from Justiniano, who misused only a tiny fraction of the time they did.  But even if they were not distinguishable, two examples -- without any contemporary statement of their reasoning -- do not a policy make.  They certainly do not establish a policy that "no reasonable factfinder could fail to find." *United Steelworkers of Am.*, 983 F.2d at 244.

Finally, Bally's maintains that the NLRB misconstrued the testimony of its director of operations, Richard Tartaglio.  At the ALJ hearing, Tartaglio testified:  "If [Justiniano] would have said [he left the rally] any time prior to 12:00, then we wouldn't be here today."  Hr'g Tr. at 231 (J.A. 247).  Because "Tartaglio knew that Justiniano did not need to care for his daughter until 30 minutes later," the Board inferred that Tartaglio discharged Justiniano "for a reason other than that he spent 20 minutes of his FMLA leave on something [that was not a] family or medical necessity."  355 N.L.R.B. No. 218, at 4; *see id.* (stating that this is what the testimony "suggests").  Bally's contends that when Tartaglio's "testimony is considered in context with his other testimony, one reaches the same conclusion as the ALJ -- that Mr. Tartaglio meant that Justiniano would not have been guilty of misusing his leave time if he left the rally before noon *and had been caring for his daughter*."  Pet. Br. 32-33 (emphasis added by petitioner).

We are inclined to agree with Bally's that, in context, the Board derived the wrong inference from Tartaglio's testimony. But whether or not we agree with Bally's is not the question. Rather, "'we ask only whether on this record it would have been possible for a reasonable jury to reach the Board's conclusion[s], *giving substantial deference to the inferences drawn by the*

[*Board*] from the facts.'" *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 543 (D.C. Cir. 2006) (quoting *Ceridian Corp. v. NLRB*, 435 F.3d 352, 357 (D.C. Cir. 2006)) (emphasis added). "So long as the Board's findings are reasonable, we will not substitute our own judgment even if we would have come to a different conclusion in the first instance." *Id.*

Moreover, even if the Board's inference were not only wrong but unreasonable, it would make no difference to our disposition. The Board's discussion of Tartaglio's testimony came at the tail end of its opinion, after it had already completed the *Wright Line* analysis discussed above. It then observed that its conclusion, that Bally's discharged Justiniano because he spent time at the union rally, was "*supported by* Tartaglio's testimony." 355 N.L.R.B. No. 218, at 4 (emphasis added). It is thus plain that whatever weight the Board accorded that testimony, it was not necessary to its decision. And as we noted in the coincidentally entitled *Casino Airlines* case, "[w]hen an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006) (quoting *Mail Order Ass'n. of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 434 (D.C. Cir. 1993)) (additional internal quotation marks omitted).

To be sure, the NLRB *could* have credited Bally's' argument that it would have fired Justiniano regardless of his support for the union. *See Traction Wholesale Ctr.*, 216 F.3d at 100. "The only question before us, however, is whether substantial evidence supports the Board's view of the disputed events, not [the petitioner's]." *Id.* Indeed, "'[w]e are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is

circumstantial.'" *Id.* at 99 (quoting *Vincent Plastics Inc. v. NLRB*, 209 F.3d 727, 734 (D.C. Cir. 2000)); *see Progressive Elec.*, 453 F.3d at 549. Under this standard of review, we have no warrant for disturbing the Board's conclusion that Justiniano's termination was unlawful.

## III

For the foregoing reasons we deny the petition for review and grant the Board's cross-application for enforcement.

*So ordered.*