# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 5, 2023           Decided August 4, 2023

No. 20-1429

XCEL ENERGY SERVICES INC., ON BEHALF OF ITS PUBLIC
UTILITY AFFILIATE, SOUTHWESTERN PUBLIC SERVICE
COMPANY,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

GOLDEN SPREAD ELECTRIC COOPERATIVE, INC., ET AL.,
INTERVENORS

———

Consolidated with 22-1049, 22-1064

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Joseph W. Lowell* and *Phyllis G. Kimmel* argued the causes for petitioners.  With them on the joint briefs was *Timothy T. Mastrogiacomo*.  *Pamela Wu* and *Stephen M. Spina* entered appearances.

*Beth G. Pacella*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Matthew J. Binette* argued the cause for intervenors for respondent. With him on the brief were *John Longstreth*, *Donald A. Kaplan*, *Victoria M. Lauterbach*, *Gunnar Birgisson*, *Daniel E. Frank*, *Allison E. Speaker*, and *Richard M. Lorenzo*.

Before: SRINIVASAN, *Chief Judge*, RAO and CHILDS, *Circuit Judges*.

Opinion filed for the Court by *Circuit Judge* CHILDS.

CHILDS, *Circuit Judge*: In the energy industry, utility companies can ask their Regional Operator to fulfill a transmission service request, a physical transfer of power to its electrical grids. That increased power may require use of an existing physical structure that amplifies the grid's capability, known as a Creditable Upgrade.

It is the Regional Operator's responsibility to assess charges for Creditable Upgrade usage. The Tariff standard for doing so is whether use of an upgrade is not needed "but for" the request. A methodology then actualizes that standard to assign the associated costs directly to the utility company for reimbursement by their customers.

In this consolidated appeal of the Federal Energy Regulatory Commission's (FERC) orders, two utility companies argue that Attachment Z2 plainly requires utilizing the N-1 Contingency Analysis (N-1) methodology. And they assert that FERC erred in concluding that the Tariff was ambiguous, relying on extrinsic evidence to interpret that the

Reservation Stack Analysis (RSA) was the appropriate methodology. Second, they claim that the Regional Operator violated the filed rate doctrine because the filed rate was unclear about how much they would be charged. Finally, Petitioners contend that their charges offend Attachment Z1 because the Regional Operator neither identified the upgrade facilities that would accommodate their requests nor provided them with an estimate of the costs of such upgrades.

We deny in part and dismiss in part the petitions for review. FERC correctly concluded that Section II.B of Attachment Z2 does not plainly require the N-1 methodology because the Tariff is ambiguous. Further, FERC's reliance on extrinsic evidence to ascertain that the Tariff allows the RSA methodology was not arbitrary and capricious. We lack jurisdiction to consider Petitioners' filed rate doctrine argument because they failed to exhaust it at the rehearing stage below. And the challenged sections of Attachment Z1 do not concern the Attachment Z2 charges for which Petitioners complain.

# I.

## A.

Kansas Electric Power Cooperative, Inc. (KEPCo) and Xcel Energy Services, Inc. (Xcel) (collectively, Petitioners) are utility companies that distribute electricity to their customers. Intervenor Southwest Power Pool, Inc. (Regional Operator) provides transmission services for that electricity. Its electrical transmission lines stretch approximately 60,000 miles, from Arkansas to Wyoming and from Texas to North Dakota. The terms and conditions between Petitioners' and the Regional Operator's contracted services are governed by individual service agreements. Incorporated in those service agreements

is a Tariff, which sets the rates of service. Attachment Z is the Tariff at issue in this consolidated appeal.

"Attachment Z provide[s] that a utility [] initially fund[s] upgrades needed to accommodate its expansion of service . . . . Other utilities that subsequently use the upgraded transmission facilities . . . pay a share of the upgrade costs." *Okla. Gas & Elec. Co. v. FERC*, 11 F.4th 821, 825 (D.C. Cir. 2021). Attachment Z "does not guarantee full reimbursement; rather, it provides financial compensation to the funding customer when use is made of the Network Upgrades . . . ." *Sw. Power Pool*, 122 FERC ¶ 61,060, 61,370 (2008).

In 2008, FERC approved splitting Attachment Z into the two attachments relevant to this appeal. Attachment Z2 provides the standard which figures Petitioners' costs for use of *existing* Creditable Upgrades.

The same year that FERC approved Attachment Z2's creation, the Regional Operator proposed a revision to provide revenue credits from transmission service requests "that could not be provided 'but for'" the upgrade. Request For Rehearing of Xcel Energy Services Inc. [hereinafter Xcel Reh'g Req.] at 22, J.A. 420 (quoting Regional Operator Transmittal Letter at 7–8); *see also* Request for Rehearing of Kansas Electric Power Cooperative, Inc. [hereinafter KEPCo Reh'g Req.] at 19 nn.63–64, J.A. 161. The Regional Operator's goal was to reimburse utilities that supply entities by using network upgrades for usage not only by customers who received service in the forward direction of the initial overload but also from those who received energy in the backward direction. *Sw. Power Pool*, 123 FERC ¶ 61,208, 62,329 (2008). The "but for" language augmented, but did not disturb, the Tariff's dual standard that utilities be charged for any request's "subsequent incremental use" of the Creditable Upgrade itself.

FERC accepted the Regional Operator's filing requesting the additional "but for" language and the Regional Operator's reasoning that the revision would complement a continued "subsequent incremental use" standard to assess upgrade charges. *Id*. Petitioners did not object to FERC's order at the time. And neither the filing requesting the Attachment Z2 revision nor FERC's order approving it mentioned any methodology because both were still being developed. Indeed, the software needed to calculate the credits was not developed until 2015. *See Okla. Gas*, 11 F.4th at 825.

The relevant version of Attachment Z2, Section II.B, provides:

> Revenue for credits will be provided from (i) new Long-Term Network Integration Transmission Service, and (ii) new transmission service taken under the non-rate terms and conditions of this Tariff by Transmission Owners subject to Section 39.1 of this Tariff, that *could not be provided but for one or more Creditable Upgrades* to accommodate designation of new Network Loads or Transmission Owner's(s') loads, new Designated Resources or increases in the designation of existing Designated Resources above previously designated levels.

Attachment Z2, § II.B (2013), Pet'r's Br. at A28 (emphasis added).[1] In the immediate next sentence, the Tariff introduces the phrase "subsequent incremental use." *Id.* It states:

> Revenue credits shall be determined based upon the *subsequent incremental use* of each affected Creditable

---

[1] Attachment Z2 was revised in 2008, 2010, and 2013. The 2010 and 2013 revisions did not augment Section II.B's "but for" and

Upgrade for such new or increased Network Load or Transmission Owner load or Network Resource.

*Id.* (emphasis added).

Under Attachment Z1, however, the Regional Operator studies long-term transmission service requests to determine whether any *new* transmission facilities or *new* network upgrades to existing facilities are needed to accommodate transmission service requests. As relevant here, the Tariff requires the Regional Operator to do two things: (1) "determine the upgrades required to reliably provide all of the requested service," Attachment Z1, § III.a (2010), Pet'r's Br. Addendum at A12, and (2) "identify the facilities limiting the availability of the requested aggregate transmission service and the upgrades required to provide this service." *Id.* § III.c at A13.

**B.**

Petitioners' transmission service requests occurred between 2008 and 2010. When service requests are submitted, the Regional Operator conducts an Aggregate Facilities Study Report to identify a cost estimate. The Regional Operator issued these reports in 2012.

For KEPCo, the Regional Operator noted in Table Three of the Aggregate Study Report that KEPCo may need to pay four Creditable Upgrade charges. Table Two, however, stated that KEPCo's four transmission service requests had no Creditable Upgrade charges allocated to them. For Xcel, the report noted that Petitioners may need to pay for twenty-five

"subsequent incremental use" language at issue in this appeal. In this opinion, we will refer to the 2013 version because that was the most recent Tariff for which Petitioners were assessed charges in 2016.

Creditable Upgrades.  At least one report explained that the service agreement would identify the "terms and conditions of . . . confirmed service."  Aggregate Facilities Study Rep. at 2, J.A. 65.

KEPCo's four service agreements confirmed zero Creditable Upgrade charges.  The agreement stated, "[t]hese upgrade costs are not assignable to the Network Customer."  Complaint Requesting Fast-Track Processing of Kansas Electric Power Cooperative, Inc. at 12, J.A. 12 (citation omitted).   Xcel's service agreement, however, confirmed charges for five Creditable Upgrades.

Meanwhile, a working group within the Regional Operator developed a methodology to realize Attachment Z2's dual "but for" and "subsequent incremental use" standards.  That work was reflected in a White Paper, which compared two methodologies: N-1 and RSA.  2011 Crediting Process Task Force White Paper [hereinafter White Paper] at 1–20, J.A. 272–92.  N-1 works like this: Petitioners' transmission service requests are configured within a computerized transmission system model.  The model then runs two simulations, one with the upgrade and one without it, to gauge whether the request required use of the upgrade.  If the resulting transmission model cannot sustain the transmission service request without the benefit of the upgrade, the service request satisfies the "but for" condition, and revenue credits are due.  It is, therefore, a model that analyzes request-by-request and upgrade-by-upgrade.

For various reasons, the White Paper concluded that the N-1 methodology was impractical.  White Paper at 2–3, J.A. 274–75.  First, it would be adversely impacted by the volume of transmission service requests.  That is because each request would need to be analyzed against each upgrade to see if the

upgrade is necessary. Hundreds of requests occur each hour. Second, the methodology could be affected by the order in which each request and upgrade are assessed. Third, the methodology's baseline transmission model could be imprecise with embedded past-upgrades needed for past-approved requests. As a result, it would require that past-upgrades be removed to study whether recent requests benefit from the same upgrade. But, likely, new requests would still need the baseline upgrade, obfuscating whether the "but for" test is clearly met.

Given the N-1 methodology's shortcomings, the White Paper recommended the RSA methodology. White Paper at 3–7, J.A. 275–79. After combining multiple like transmission service requests into a stack, determining whether that stack cumulatively utilizes at least three percent of a particular type of upgrade, and configuring the direction and magnitude of the stack's impact on the upgrade, it then applies three rules. White Paper 4–6, 8, J.A. 276–78, 280. For forward energy flows, Rule One determines if the reservation stack subsequently uses the upgrade in the same direction which caused the upgrade to be needed. For backward energy flows, Rule Two figures if the reservation stack could not have been provided at the time immediately before use of the upgrade "but for" the capacity provided by the upgrade. Rule Three augments Rule Two if the requests are long-term or short-term. The application of these three rules varies depending on the particular upgrade at issue. After all rules are applied, the Regional Operator determines the cost associated for use of the upgrade. Ultimately, stakeholders, including Petitioners, unanimously endorsed the White Paper's conclusions.

In 2016, applying the RSA methodology, the Regional Operator imposed upgrade charges that had not been specifically mentioned in the service agreements. The

Regional Operator billed KEPCo for seven Creditable Upgrades, totaling $6.2 million. Four of those upgrades were not included in Table Two of the 2010 Aggregate Study Report and none were included in its service agreements. Similarly, the Regional Operator billed Xcel for 101 Creditable Upgrades, totaling $12.8 million. Seventy-six of those upgrades were not identified in its aggregate study, and ninety-six were not included in its service agreement.

**C.**

In 2016 and 2017, Petitioners filed complaints with three primary arguments relevant to this appeal. First, they argued that the Regional Operator's assignment of certain Creditable Upgrade charges using the RSA methodology violated Attachment Z2's "but for" standard. Second, they contended that the Regional Operator violated the filed rate doctrine because, in part, the filed rate failed to include the upgrade charges that they would ultimately be assessed. Finally, they argued that the Regional Operator disregarded Attachment Z1's instruction to determine the required upgrades and their requisite cost estimates.

FERC dismissed each Petitioner's complaint. First, FERC decided that Attachment Z2's "but for" standard did not plainly require the N-1 methodology. Order on Complaint and Establishing Hearing and Settlement Judge Procedures [hereinafter KEPCo Compl. Ord.], 161 FERC ¶ 61,145 (2017), J.A. 120; Order on Complaint [hereinafter Xcel Compl. Ord.], 162 FERC ¶ 61,203 (2018), J.A. 390. FERC explained that the RSA methodology better realized the Tariff's standards by relying on two sources of extrinsic evidence: the 2012 White Paper and the Regional Operator's 2008 filing requesting the addition of the "but for" language to Attachment Z2. KEPCo Compl. Ord. ¶¶ 64–72, J.A. 119–24; Xcel Compl. Ord. ¶¶ 73–

76, J.A. 390–91 (collapsing the filed rate doctrine and Attachment Z2 analyses into one). Second, FERC rejected Petitioners' contention that the Attachment Z2 charges violated the filed rate doctrine. It decided that Petitioners were notified of possible upgrade charges in the Aggregate Facilities Study Reports and the White Paper. KEPCo Compl. Ord. ¶¶ 60–61, J.A. 117–18; Xcel Compl. Ord. ¶¶ 73–76, J.A. 390–91. Finally, FERC concluded that the Regional Operator did not violate Attachment Z1, KEPCo Compl. Ord. ¶¶ 62–63, J.A. 118–19; Xcel Compl. Ord. ¶¶ 77–79, J.A. 392–93, reasoning that when the Regional Operator stated that charges may be assessed in the 2010 Aggregate Study Report, it satisfied its obligations. KEPCo Compl. Ord. ¶ 63, J.A. 119; Xcel Compl. Ord. ¶ 77, J.A. 392.

Petitioners then requested a rehearing. They argued that: FERC's interpretation of Attachment Z2 violated its plain terms; FERC did not make any findings that Attachment Z2 was ambiguous; FERC wrongly considered extrinsic evidence to alter the meaning of Attachment Z2; and FERC disregarded Xcel's evidence. Petitioners also contended that FERC erred in finding that the Regional Operator's assignment of upgrade charges did not violate the filed rate doctrine because it failed to list the total number of charges Petitioners would be required to pay. And they re-emphasized that the Regional Operator violated Attachment Z1's process requirements.

FERC denied the requests for rehearing. In its rehearing orders, FERC affirmed most of its prior rulings. Order on Complaint and Establishing Hearing and Settlement Judge Procedures [hereinafter KEPCo Reh'g Ord.], 178 FERC ¶ 61,095 (2022), J.A. 177–79, 182–87; Order Addressing Arguments Raised on Rehearing [hereinafter Xcel Reh'g Ord.], 178 FERC ¶ 61,096 (2022), J.A. 450–58. However, FERC no longer concluded that Petitioners had notice for charges during

the historical period (2008-2016) because Attachment Z2 "did not provide notice that upgrade users could be charged outside of Section I.7.1.'s [one-year] billing requirements." *Okla. Gas*, 11 F.4th at 831; *see also* KEPCo Reh'g Ord. ¶¶ 16–18, J.A. 173–75; Xcel Reh'g Ord. ¶¶ 39–41, J.A. 460–61. Regardless, Attachment Z2 still provided notice of prospective obligations after 2016. KEPCo Reh'g Ord. ¶ 18, J.A. 175; Xcel Reh'g Ord. ¶ 41, J.A. 461.

Petitioners timely filed petitions for review.

## D.

We review FERC's actions under the Administrative Procedure Act's "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). And we must uphold FERC's determination "if the agency has examine[d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Elec. Power Supply Ass'n*, 577 U.S. at 292 (alterations in original) (quotations and citation omitted); *see also Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1017 (D.C. Cir. 2022).

## II.

## A.

We first answer whether Attachment Z2, Section II.B plainly requires the N-1 methodology. It does not.

"When reviewing [FERC's] interpretation of a [T]ariff, this [C]ourt first consider[s] *de novo* whether the relevant language unambiguously addresses the matter at issue, and if

so, we apply that unambiguous meaning." *Okla. Gas*, 11 F.4th at 827 (quotations and citation omitted). "If, however, there is ambiguity, we defer to [FERC's] construction so long as that construction is reasonable." *Id.*; *see also Old Dominion Elec. Coop. v. FERC*, 892 F.3d 1223, 1230 (D.C. Cir. 2018); *ESI Energy, LLC v. FERC*, 892 F.3d 321, 331 (D.C. Cir. 2018).

Starting with the Tariff, Attachment Z2 states in relevant part that "[r]evenue for credits will be [assessed for transmission service requests] that *could not be provided but for one or more Creditable Upgrades . . . .*" Attachment Z2, § II.B (2013), Pet'r's Br. Addendum at A28 (emphasis added). It continues, "Revenue credits shall be determined based upon the *subsequent incremental use* of each affected Creditable Upgrade . . . ." *Id.*

Petitioners ask us to read this Tariff as plainly requiring the N-1 methodology. To do so, they argue that the RSA methodology disregards the Tariff's "but for" standard because it fails to apply it with integrity, disregarding the phrase "could not be provided" in the text. Pet'r's Br. 31–35. We disagree.

The plain text of Attachment Z2, Section II.B is ambiguous with respect to what methodology could be used to calculate charges. As FERC concluded, Petitioners' preferred N-1 methodology is not mentioned in Attachment Z2. *E.g.*, Xcel Reh'g Ord. ¶ 21, J.A. 451. And the Tariff does not prescribe how the Regional Operator is to comply with the "but for" requirement. For example, it does not specify (i) what weight a methodology should give the Tariff's dual "but for" and "subsequent incremental use" standards, (ii) how strict the methodology's application of the "but for" standard must be,

nor (iii) whether transmission service requests and a Creditable Upgrade must be analyzed on an individual basis.

Petitioners tell us, however, that FERC failed to conclude expressly that Attachment Z2 was ambiguous. But on rehearing, FERC "found that the revenue crediting process as described under Attachment Z2 in the Tariff is ambiguous." Xcel Reh'g Ord. ¶ 23, J.A. 453. It also signaled in a footnote that the Tariff contained latent ambiguity because, while the language may appear facially clear, its vagueness arises from applying the language to the underlying facts. *Id.* at ¶ 21 n.45, J.A. 451. Moreover, FERC stated that Attachment Z2 "is susceptible to more than one meaning and could be satisfied by more than one methodology." *Id.* at ¶ 22, J.A. 452–53. Even assuming FERC's explanation did not convey that the Tariff was ambiguous concerning its "but for" language, FERC never concluded that the plain text was clear.

## B.

We must next decide whether FERC's interpretation of Attachment Z2, Section II.B was reasonable. It was. The two sources of extrinsic evidence that FERC relied on to conclude that the RSA methodology was the correct interpretation of Attachment Z2, Section II.B are the following: a 2012 White Paper and the Regional Operator's 2008 filing requesting the addition of the "but for" language to Attachment Z2. Each of these was within FERC's purview to ascertain Attachment Z2's meaning in light of the Tariff's ambiguity.

This Court affords "substantial deference" to FERC's interpretations of ambiguous Tariff provisions, even when it uses extrinsic evidence. *Old Dominion Elec. Coop., Inc. v. FERC*, 518 F.3d 43, 49 (D.C. Cir. 2008). Indeed, "[o]nly if [a Tariff] is ambiguous can FERC consider extrinsic evidence as

an aid to interpretation." *Appalachian Power Co. v. FERC*, 101 F.3d 1432, 1435 (D.C. Cir. 1996) (citation omitted).

**1.**

Relying on the White Paper, FERC concluded that the N-1 methodology was practically inferior to the RSA.  The White Paper conducted a thorough feasibility study that compared the two methodologies.  It detailed that the RSA methodology pools like transmission service requests and applies Rules to best realize the Tariff's dual "but for" and "subsequent incremental use" standards.  FERC agreed.  Because of the volume and order of transmission service requests, and problems with the base model of the N-1 methodology, FERC decided that the N-1 methodology would be a poor tool to isolate whether a particular upgrade is not needed "but for" the requests.  KEPCo Reh'g Ord. ¶ 37 nn.85–86, J.A. 184; Xcel Reh'g Ord. ¶ 22 nn.47–48, J.A. 452.

Petitioners' attempts to weaken the White Paper's practical comparison as either contradicting the substantial evidence before FERC or as the result of unreasoned decision making fail.  Petitioners largely make three complaints about the White Paper: 1) that it was considered four years after Attachment Z2 was agreed to in 2008 and thus cannot be used as extrinsic evidence of intent; 2) that it contradicts the plain text of Attachment Z2's "but for" test because FERC describes the RSA methodology as merely "facilitating" a transmission service request; and 3) that FERC misrepresents the N-1 methodology's feasibility because, in 2018, the Regional Operator decided that it would eliminate short-term transmission requests as eligible for Creditable Upgrades, thereby reducing the vast number of reservation requests that make the N-1 methodology more practically difficult to implement.  We will take each in turn.

First, in considering the White Paper, FERC noted *Farmland Industries, Inc. v. Grain Board of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990), which stated that "if extrinsic evidence supports more than one reasonable interpretation of the contract, . . . the trier of fact [can] resolve the dispute." KEPCo Reh'g Ord. ¶ 39 n.88, J.A. 185; Xcel Reh'g Ord. ¶ 24, n.50 J.A. 453. But "it is not necessary to give weight to extrinsic evidence made during litigation and prepared long after the contract has been negotiated." *Amerada Hess Pipeline Corp. v. FERC*, 117 F.3d 596, 606–07 (D.C. Cir. 1997); *see* KEPCo Reh'g Ord. ¶ 38, n.88, J.A. 185.

Here, while the White Paper did post-date the service agreement, numerous transmission customer stakeholders, including Petitioners, unanimously endorsed its conclusion that the RSA methodology was preferred to the N-1 methodology. KEPCo Reh'g Ord. ¶ 6, J.A. 169; Xcel Reh'g Ord. ¶ 7, J.A. 445. And the 2012 White Paper's purpose was to realize Attachment Z2's "but for" standard. *See* White Paper at 1, J.A. 273. Further, *Amerada* did not prohibit *any* consideration of delayed extrinsic evidence merely because of a time difference. 117 F.3d at 606–07. On the record before us, reliance upon the White Paper is not erroneous solely because it followed Attachment Z2.

Second, Petitioners argue that FERC erred in describing the RSA methodology as merely "facilitat[ing]" use of a Creditable Upgrade rather than describing usage as "necessary," per the Tariff's standards. Pet'r's Br. 41–43. And by doing so, "FERC is mistaking the White Paper's own characterization of its process for what the process *actually* does." *Id.* at 43. However, FERC's reasoning reveals that it correctly understood the RSA methodology. At the outset, FERC reasoned that the RSA methodology "gives meaning

both to the 'but for' language and the 'subsequent use' language in the Tariff . . . ." Xcel Reh'g Ord. ¶ 25, J.A. 454. It also explained that "[t]o be considered a 'Creditable Upgrade' in the first instance, the upgrade will have been determined to be *needed* to relieve a constraint to accommodate flow from the previously-granted service." *Id.* at ¶ 24, J.A. 453 (emphasis added). That explanation follows the White Paper, which made clear that it did not automatically include just "any use of the upgrade" but only those above a three-percent effect on Creditable Upgrades and in the same direction as the needed upgrade. White Paper at 4–6, 8, J.A. 276–78, 280. Thus, FERC did not err in describing the RSA methodology and in concluding that it satisfies Attachment Z2, Section II.B.

Petitioners next argue that FERC misrepresented the feasibility of the N-1 methodology because, in 2018, the Regional Operator decided it would eliminate short-term transmission requests as eligible for Creditable Upgrades. *Sw. Power Pool, Inc.*, 163 FERC ¶ 61,092 (2018). But FERC did not reason that the N-1 methodology was only plagued by the volume of *short-term* requests. KEPCo Reh'g Ord. ¶ 37 nn.85–86, J.A. 184; Xcel Reh'g Ord. ¶ 22 nn.47–48, J.A. 452. As the White Paper noted, and the Regional Operator's witness confirmed, the volume of requests—both long-term and short-term—affect the N-1 methodology's practicality. *See* White Paper at 2–3, J.A. 274–75; KEPCo Reh'g Ord. ¶ 37 n.85, J.A. 184. Besides, as FERC explained, the N-1 methodology is also inaccurate due to the order of requests and its baseline transmission model that could already include needed upgrades. White Paper at 2–3, J.A. 274–75. Petitioners' attack against just one of the N-1 methodology's weaknesses does not persuade us that FERC's reasoning—even with short-term requests deemed ineligible for utilizing Creditable Upgrades post-2018—contradicts the evidence before it.

17

**2.**

FERC's second source of extrinsic evidence for the RSA methodology comes from a filing and order almost a decade before charges were assigned to Petitioners.  FERC explained in detail how, in 2008, when Attachment Z2 was first created, the Regional Operator revised its Tariff to add the "but for" language.  KEPCo Reh'g Ord. ¶ 42, J.A. 187; Xcel Reh'g Ord. ¶¶ 27–29, J.A. 455–56.  The point was to prevent free riders who benefit from transmission service for backward-flowing energy.  *Sw. Power Pool*, 123 FERC ¶ 61,208, 62,329.  In its filing, the Regional Operator reiterated that the "proposal [wa]s consistent with currently effective Section VII.2 of Attachment Z (now Section [II.B] of Attachment Z2), which requires network customers to pay for new[,] or increased uses of network upgrades."  Xcel Reh'g Req. at 22, J.A. 420 (citation omitted).  FERC accepted the Regional Operator's request without qualification.  *See Sw. Power Pool*, 123 FERC ¶ 61,208, 62,329.  And Petitioners did not object at that time to the Regional Operator's proposed filing or FERC's order.  As FERC noted, the revised Tariff confirmed far earlier than the 2016 charges that the correct methodology would perform both the "but for" and the "subsequent incremental use" standards.  *See* KEPCo Reh'g Ord. ¶ 42, J.A. 187; Xcel Reh'g Ord. ¶ 28, J.A. 455.

In sum, FERC's reasoning was not arbitrary and capricious in concluding that the RSA methodology best realizes the Tariff's standards for how to assess Creditable Upgrade charges.  Accordingly, we cannot say that FERC's orders

contradicted the substantial evidence before it. Nor can we say that the orders constituted unreasoned decision making.

## II.

We next address whether FERC erred in concluding that the Regional Operator did not violate the filed rate doctrine. We cannot consider the merits of that question because Petitioners failed to exhaust at the rehearing stage below that its complaint was about the filed rate's lack of specificity.

The Federal Power Act requires public utilities to file with FERC schedules showing "*all rates and charges*" and the "classifications, practices and regulations affecting such rates and charges." 16 U.S.C. § 824d(c) (emphasis added). Such is the filed rate doctrine, which "assures that customers receive adequate notice of their utility costs." *Ark. Pub. Serv. Comm'n v. FERC*, 891 F.3d 377, 383 (D.C. Cir. 2018). That doctrine is impenetrable and does not yield to equities. *Okla. Gas*, 11 F.4th at 829–30.

But 16 U.S.C. § 825*l*(a) requires that parties "set forth [the grounds for rehearing] specifically." That obligation is jurisdictional. *New Eng. Power Generators Ass'n v. FERC*, 879 F.3d 1192, 1197–98 (D.C. Cir. 2018); *Wabash Valley Power Ass'n v. FERC*, 268 F.3d 1105, 1114 (D.C. Cir. 2001) (describing the Federal Power Act's exhaustion requirement as an "unusually strict requirement").

On appeal, Petitioners argue that "FERC overlooks the fact that . . . [S]ection 205(c) of the Federal Power Act and FERC's own implementing regulations . . . create the obligation to *specify all charges in the service agreements*." Pet'r's Br. 53 (emphasis added). But below, their arguments did not concern whether Attachment Z2's "but for" language was specific

enough to qualify as a filing of the rate. Rather, they argued whether their assessed charges generally appeared in the filed rate. KEPCo Reh'g Req. at 7–13, J.A. 149–55; Xcel Reh'g Req. at 30–37, J.A. 428–35. For example, below, "KEPCo explained that it relied on the[ service] agreements that did not specify directly assigned cost liability—or even indicate a possibility of directly assigned cost liability—for Z2 facilities." KEPCo Reh'g Req. at 9, J.A. 151. Yet, that argument pertains to whether the Regional Operator failed to list the number of all Creditable Upgrades that might be required, not that Attachment Z2, Section II.B and the service agreements were too vague to qualify as a filed rate. Therefore, this Court cannot squint its eye to read into Petitioners' use of the word "specify," KEPCo Reh'g Req. at 9, J.A. 151, to clear the jurisdictional hurdle for "specific[]" arguments. 16 U.S.C. § 825*l*(a).

Had Petitioners been clearer about their complaint, FERC's orders below may have been different. Perhaps, FERC would have noted this Court's relevant precedents regarding a filed rate's specificity. *See, e.g.*, *Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985); *Keyspan-Ravenswood, LLC v. FERC*, 474 F.3d 804 (D.C. Cir. 2007); *see also* Oral Arg. Tr. 73:12–24. Those cases were missing throughout Petitioners' briefing below. And FERC may have been prompted to defend or contextualize its use of the unfiled White Paper as rate-setting. *See* Oral Arg. Tr. 65:3–14. But FERC did not do so because Petitioners were imprecise in presenting their arguments below. Ultimately, exhausting specific arguments is Petitioners' burden.

**III.**

Finally, we must answer whether Attachment Z1 requires the Regional Operator to notify Petitioners of all their charges under Attachment Z2.  It does not.

Attachment Z1 requires that the Regional Operator (1) "determine the upgrades required to reliably provide all of the requested service," Attachment Z1, § III.a (2010), Pet'r's Br. Addendum at A12, and (2) "identify the facilities limiting the availability of the requested aggregate transmission service and the upgrades required to provide this service."  *Id.* § III.c at A13.  By its own terms, Attachment Z1 does not concern the Attachment Z2 charges for which Petitioners complain.  Because of that difference, this Court cannot use it to reverse FERC's order below.

FERC appropriately noted that the purpose of Attachment Z1 is to identify *new* transmission facilities or *new* upgrades to existing facilities, while Attachment Z2 is designed to calculate a customer's obligation to pay for its use of *existing* Creditable Upgrades funded by others.  *See* KEPCo Reh'g Ord. ¶¶ 4–5, J.A. 168–69; Xcel Reh'g Ord. ¶¶ 4–5, J.A. 443–44; *see also* Int. Br. 31–33.  Although FERC did not expressly invoke this rationale as the basis for rejecting Petitioners' Attachment Z1 challenge, we may nevertheless affirm FERC's order because, "when an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain the decision as long as one is valid and 'the agency would clearly have acted on that ground even if the other were unavailable.'" *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 939 (D.C. Cir. 2011) (quoting *Casino Airlines, Inc. v. Nat'l Transp. Safety Bd.*, 439 F.3d 715, 717 (D.C. Cir. 2006)); *see also Texas Neighborhood Services v. HHS*, 875 F.3d 1, 7 (D.C. Cir. 2017) (holding an agency's arbitrary failure to consider an issue was

harmless because its other reasonable conclusions "amply supported [its] decision").

Because the difference between Attachment Z1 and Attachment Z2 arises out of their plain texts, and FERC's orders acknowledged that difference, we conclude FERC "would clearly have acted on [this] ground even if the other [grounds] were unavailable." *Bally's Park Place, Inc.*, 646 F.3d at 939 (quotations and citation omitted). Therefore, denying the petitions for review on this issue is consistent with this Court's precedents.

* * *

For the foregoing reasons, we dismiss in part the petitions for review related to the filed rate doctrine because that issue was not exhausted at the rehearing stage below. We otherwise deny in part the petitions for review.

*So ordered.*